# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued October 7, 2016          Decided December 27, 2016

No. 15-7121

ENRON NIGERIA POWER HOLDING, LTD.,
APPELLEE

v.

FEDERAL REPUBLIC OF NIGERIA,
APPELLANT

Appeal from the United States District Court
for the District of Columbia
(No. 1:13-cv-01106)

*David Elesinmogun* argued the cause and filed the briefs for appellant.

*Kenneth R. Barrett* argued the cause and filed the briefs for appellee.

Before: ROGERS, TATEL and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* ROGERS.

ROGERS, *Circuit Judge*: In 1999, the Republic of Nigeria entered into a power purchase agreement ("PPA") with Enron Nigeria Power Holding, Ltd. ("ENPH"), for construction of

electrical facilities. Days later, Nigeria suspended implementation of the PPA, and after years of attempted renegotiation over one phase of construction proved fruitless, ENPH filed under the PPA for arbitration by the International Chamber of Commerce's International Court of Arbitration ("ICC"). The ICC issued an Award in ENPH's favor. When collection efforts failed, ENPH filed a petition for confirmation and enforcement of the Award in the federal district court here. Nigeria now appeals from the order granting enforcement of the Award.

Invoking Article V(2)(b) of The Convention on the Recognition and Enforcement of Foreign Arbitral Awards (known as the "New York Convention"), 21 U.S.T. 2517, Nigeria contends that enforcement of the Award violates the public policy of the United States not to reward a party for fraudulent and criminal conduct. It maintains that ENPH and Enron International Corporation ("Enron") are alter egos, and, alternatively, that ENPH made false and fraudulent representations about Enron to induce Nigeria to enter the PPA. Although the question whether enforcement of the Award should be denied on public policy grounds is a question for the courts to answer, the interpretation of the PPA, by its terms, was for the ICC. The ICC's findings, to which an enforcing court owes substantial deference, doom Nigeria's public policy defense in the absence of evidence or equities warranting the piercing of Enron's corporate veil. Accordingly, for the following reasons, we affirm the order enforcing the Award.

**I.**

The New York Convention is a multilateral treaty that, with exceptions, obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such

agreements. *Comm'ns Import Export S.A. v. Republic of the Congo*, 757 F.3d 321, 324 (D.C. Cir. 2014). The United States and Nigeria are signatories to the Convention, 21 U.S.T. 2517, and Chapter 2 of the Federal Arbitration Act implements the Convention. 9 U.S.C. §§ 201–08. The FAA provides that the court "shall confirm the award unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention." *Id.* § 207. Article V of the Convention sets forth the grounds for refusal or deferral of enforcement. As relevant, Article V(2)(b) of the New York Convention provides:

> Recognition and enforcement of an arbitral award may also be refused if the competent authority in the country where recognition and enforcement is sought finds that . . . [t]he recognition or enforcement of the award would be contrary to the public policy of that country.

The following facts found by the ICC bear on Nigeria's appeal. In 1999, Lagos State, a regional government in Nigeria, was "in desperate need of energy." ICC Partial Award ("ICC") ¶ 45 (incorporated by reference in the Final Award). By letter of June 19, 1999, Enron International expressed interest in working with Lagos State, stating that "Enron is the highest ranking power and gas company and is the leading company worldwide in such industry." ICC ¶ 246. A month later, Enron formed ENPH as a special-purpose vehicle to construct and operate power plants in Lagos State. ICC ¶ 2. The following month, Lagos State entered into a Memorandum of Understanding ("MOU") on the first and second phases of the construction project with ENPH and YFP (a Nigerian power company) in which it was agreed that the companies and their affiliates (including Enron) had the technical and financial capacity to perform the project, having developed gas pipelines

in the United States, Colombia, Bolivia, and Brazil, and electric power plants worldwide. ICC ¶ 247. On November 17, 1999, ENPH representatives and an employee of Enron International met with representatives of Nigeria, including President Obasanjo of Nigeria and the Governor of Lagos State. At the meeting, ENPH gave a PowerPoint presentation touting Enron's vast financial and technical capabilities and describing Enron as the company with which ENPH was "affiliated." ICC ¶¶ 239-40.

On December 6, 1999, Nigeria, Lagos State, the National Electric Power Authority of Nigeria ("NEPAN"), and ENPH executed the PPA, with ENPH as "Owner" of the energy facilities, Lagos State as "Purchaser" of the energy, NEPAN as regulator of the facilities it would connect to Nigeria's power grid, and Nigeria as "Guarantor." PPA Recitals (Dec. 6, 1999); ICC ¶¶ 25, 28. Enron was not a party to the PPA, nor was its participation in the construction project mentioned in the PPA. ICC ¶ 243. The PPA provided for three phases of construction: Phase I, three offshore, barge-mounted electricity generating units; Phase II, an on-shore power plant in Lagos; and Phase III, an additional set of barge-mounted units. PPA Clause 1; ICC ¶ 27. As regards Phase II, ENPH's obligations were contingent upon satisfaction of certain conditions by December 31, 2000, including possession of a plant site, all necessary easements from Lagos State and Nigeria, and a security letter of credit. PPA Clause 3.1. ENPH was authorized to seek independent "financing for at least 70 percent of the full capital costs" of the onshore power plant, pipeline, and other Phase II facilities. PPA Clause 3.1(iii). The parties were bound to use all reasonable efforts to ensure that the conditions were timely satisfied. PPA Clause 3.2. Additionally, the PPA provided that all disputes not informally resolved between the parties would be settled by binding arbitration under the Rules of Arbitration of the ICC. PPA Clause 23.3.

Nine days after the PPA was executed, NEPAN wrote to ENPH that implementation of the PPA was "stayed until further notice." ICC ¶ 50 (quoting NEPAN Ltr. Dec. 15, 1999). Five days earlier, the World Bank had written to Nigeria, Lagos State, and NEPAN to express economic criticisms of a draft of the PPA. ICC ¶ 49. Nigeria's President informed Lagos State in January 2000 that the Attorney General of Nigeria had concluded the PPA was invalid under Nigerian law and suggested that the PPA be renegotiated. ICC ¶ 52. In June 2000, the parties agreed to an amended PPA regarding Phases I and III — along with Enron Nigeria Barge Ltd., to which ENPH had transferred its rights and obligations with respect to those phases. ICC ¶¶ 51, 60. Thereafter, AES Nigeria Holdings Ltd. ("AES") acquired the rights to Phases I and III, along with an option to purchase Phase II, provided agreement was reached with Nigeria on amending the PPA. ICC ¶ 61.

In November 2001, Enron's collapse became public knowledge, and it filed for Chapter 11 bankruptcy protection on December 2, 2001. ICC Final Award ("ICC Award") ¶ 40. The same day, ENPH wrote to the Nigerian parties that ENPH would be unaffected by the bankruptcy and remained free to perform its obligations under Phase II. ICC Award ¶ 41. Nigeria apparently did not respond. AES contacted ENPH to express interest in extending its Phase II option; ENPH did not respond and the option expired. ICC Award ¶ 42; ICC ¶ 66. Three years later, ENPH wrote to Nigeria seeking to implement Phase II. ICC Award ¶ 43. In November 2005, after various communications, Nigeria confirmed that Phase II "was suspended and remains so." ICC Award ¶ 43 (quoting NEPAN Ltr. Nov. 22, 2005).

On June 12, 2006, ENPH filed a Request for Arbitration with the ICC regarding Phase II. The ICC found that Nigeria's

December 1999 suspension of the PPA was an anticipatory breach, but of no legal effect. ICC ¶¶ 395, 398. Nigeria had argued that because ENPH did not accept the anticipatory breach, the other parties were entitled to void Phase II of the PPA as a result of Enron's 2001 collapse. The ICC disagreed, finding that Nigeria and NEPAN had breached the PPA almost a year prior to Enron's collapse, when the December 31, 2000 deadline for satisfying Phase II conditions passed without any effort to meet those conditions. ICC ¶ 404. The ICC also found that the breach was "mainly for commercial reasons," ICC ¶ 416, and that but for concerns over price, "it would appear that the Nigerian Government would have been happy to proceed with the Original PPA," ICC Award ¶ 122. Nigeria's earlier view that the PPA was void because it violated Nigerian law was not advanced in arbitration, leading the ICC to conclude that the legal objection was not well-founded. ICC ¶ 411. Due to the breach by Nigeria and NEPAN, the ICC found, ENPH and Lagos State could not be held responsible for failing to use all reasonable efforts to perform their obligations given the deadlock caused by Nigeria and NEPAN. ICC ¶¶ 421, 454.

The ICC rejected several affirmative defenses that bear on Nigeria's current public-policy defense to enforcement of the Award. The ICC found that Enron was not a party to the PPA, nor was its participation in the project an express or implied contract term. ICC ¶¶ 203, 206. The PPA included an integration clause whereby the PPA constituted the entire agreement between the parties, which, the ICC reasoned, was a term Nigeria would never have agreed to if there had been a separate understanding that Enron would participate in Phase II. ICC ¶ 202. The ICC also found that there was no reason to infer that Enron's participation was necessary to ENPH's performance of Phase II because the PPA contemplated that ENPH would "cause" the design and construction of the facility and "cause" the financing of the project by subcontracting with

third parties (not necessarily Enron). ICC ¶¶ 188-194. For the same reasons, the ICC declined to find a collateral contract between Enron and Nigeria. ICC ¶ 210.

The ICC further rejected Nigeria's arguments that it had been induced to enter into the PPA because of fraud or misrepresentation. Allegedly false statements regarding the financial attributes of Enron made at the November 1999 PowerPoint presentation to President Obasanjo were not relevant, the ICC found, because of the legal framework of the PPA. ICC ¶ 242. Enron was not a party to the PPA and there was "no clear evidence" that these statements induced Nigeria to enter the PPA. ICC ¶ 242. Not only was there was no reason to think the parties confused Enron with ENPH, ICC ¶ 240, the PPA contained no express or implied guarantee from Enron as the parent company, ICC ¶ 242, and there was no evidence that the statements regarding Enron's technical capabilities were false. ICC ¶¶ 239–241. Further, the ICC noted, as to financial capability, the PPA provided ENPH had "recourse to independent financing of *at least 70%* of the full capital costs in the absence of any pre-identification of the entity or entities which might have financed the project." ICC ¶ 242 (quoting PPA Clause 3.1(iii) (emphasis added)). No misrepresentations were shown to be contained in Enron International's June 1999 letter to Lagos State and, in any event, the letter related to Enron and not ENPH. ICC ¶ 246. Similarly, the prior MOU regarding the financial and technical capabilities of ENPH, YFP, and their affiliates referred to Enron, not the recently incorporated ENPH. ICC ¶ 247. If the financial and technical capabilities of Enron and its affiliates were so important as to induce Nigeria to enter the agreement, the ICC reasoned, then Nigeria could have sought inclusion of a statement to that effect in the PPA. ICC ¶ 248. The ICC also rejected arguments that ENPH implicitly misrepresented its own capabilities by entering into a contract that it was incapable of performing inasmuch as the PPA

contemplated ENPH obtaining assistance from third parties. ICC ¶ 249-51.  So too, the ICC found that Enron's accounting fraud had no connection to ENPH or to Phase II of the PPA.  ICC ¶ 256-57.  Evidence showed only that Enron and Merrill Lynch, Pierce, Fenner & Smith engaged in a sham transaction, allowing Enron to "book" an imaginary $12 million profit, relating to Enron's Nigerian barges constructed under Phases I and III of the PPA.  *Id.*; *see also United States v. Brown*, 459 F.3d 509, 514–16 (5th Cir. 2006).

Finally, regarding the amount of damages to be awarded to ENPH, the ICC acknowledged that Phase II had attractive prospects on paper but found that it never got off the ground and that if it had, the collapse of Enron "would almost certainly have stopped [it] in its tracks."  ICC Award ¶¶ 97-98, 105.  That is, because the project was conceived under the assumption that Enron and its subsidiaries would construct and finance the Phase II facilities, Enron's collapse would have forced ENPH to find new contracting partners and financing.  ICC Award ¶¶ 101-103, 105-06.  The ICC accordingly found that ENPH's claim of $494 million in expected profits was too speculative and that instead "loss of chance" damages were appropriate.  ICC Award ¶¶ 109-111.  AES's unexercised option to purchase Phase II could have earned ENPH as much as $34 million, depending on the terms of an amended PPA.  ICC Award ¶ 120.  Finding a one-third chance the contingencies would have been met to allow AES to exercise the option, the ICC awarded ENPH $11.22 million in damages, plus 2% interest, legal costs and expenses.  ICC Award ¶¶ 127, 175 (Nov. 19, 2012).

On July 19, 2013, after efforts to collect proved unsuccessful, ENPH filed a petition for confirmation of the Award in the United States District Court for the District of Columbia, pursuant to 9 U.S.C. § 207.  Nigeria moved to quash service and dismiss the petition, arguing that ENPH failed to

properly effect service, that the district court lacked jurisdiction due to Nigeria's sovereign immunity, and that enforcement of the Award would violate United States public policy. Upon allowing ENPH to accomplish service through alternative means under the Foreign Sovereign Immunities Act, the district court granted ENPH's motion to confirm the Award, having ruled that Nigeria had waived its sovereign immunity in the PPA and had failed to show why enforcement should be denied on public policy grounds simply because an Enron-related entity is involved.

## II.

On appeal, Nigeria contends that enforcement of the ICC's Award to ENPH should have been denied pursuant to Article V(2)(b) of the New York Convention because its enforcement would violate the longstanding public policy that "no one shall be permitted to profit by his own fraud, or to take of his own wrong, or to found any claim upon his own iniquity or to acquire property by his own crime." Appellant's Br. 17 (quoting *Riggs v. Palmer*, 115 N.Y. 506, 511 (1889), and citing *Stone v. Freeman*, 298 N.Y. 268, 271 (1948)). ENPH presents several threshold objections to Nigeria's appeal.

## A.

In ENPH's view, Nigeria has failed to identify a well-defined public policy. *See, e.g., United Paperworks Int'l Union v. Misco, Inc*., 484 U.S. 29, 43 (1987). Nigeria's position is that the district court erred by enforcing an award based on a contract that was tainted by fraud. ENPH acknowledges that enforcing a contract with an illegal purpose would violate public policy. *See* Appellee's Br. 31. Hence, it is difficult to understand how enforcing a contract induced by fraud would not.

In *Simon & Schuster, Inc. v. Members of N.Y. State Crime Victims Board*, 502 U.S. 105 (1991), the Supreme Court observed that "most if not all States . . . ha[ve] long recognized the fundamental equitable principle that 'no one shall be permitted to profit by his own fraud,'" noting state statutes to that effect. *Id.* at 119 (quoting *Riggs*, 115 N.Y. at 511-12) (internal quotation marks and citation omitted). In *Riggs*, the New York Court of Appeals held that it would violate "universal" public policy to allow a grandson to inherit his grandfather's estate after he murdered the grandfather to prevent his being cut out of the will. 115 N.Y. at 508-09, 511-12. Likewise, in *Stone*, 298 N.Y. 268, the New York Court of Appeals recognized that "[i]t is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object." *Id.* at 271. It thus dismissed a suit by one conspirator seeking reimbursement for a bonus it paid illegally to a co-conspirator. *Id.* at 270.

ENPH attempts to limit *Riggs* and *Stone* to their facts, but the New York Court of Appeals recognized — and the Supreme Court affirmed in *Simon and Schuster* — that each of those cases rests on the "fundamental equitable principle" preventing courts from being made parties to fraud or other criminal acts. *Simon and Schuster*, 502 U.S. at 119 (quoting *Children of Bedford, Inc. v. Petromelis*, 77 N.Y.2d 713, 727 (1991)); *Stone*, 298 N.Y. at 271; *Riggs*, 115 N.Y. at 511-12. Indeed, this principle is so well-established that it underlies numerous federal statutes, such as a requirement that any person convicted of engaging in a continuing criminal enterprise "shall forfeit . . . claims against, and property or contractual rights affording a source of control over, the continuing criminal enterprise." 21 U.S.C. § 853(a)(3).

Consequently, Nigeria has adequately identified a well-

defined public policy for purposes of determining whether enforcing the Award would be repugnant to that policy.

**B.**

ENPH also maintains Nigeria has contractually waived any right to challenge the Award. The PPA provides that "any determination or award [by the ICC] shall be final and binding on all parties," and that the parties "expressly waive, to the fullest extent permitted by applicable law, any right to challenge an award by the arbitrators anywhere outside the place of arbitration agreed herein." PPA Clause 23.3.5. ENPH concludes that Nigeria's failure to challenge the award in London, Great Britain, where the arbitration took place, means that U.S. courts were divested of jurisdiction to address Nigeria's enforcement challenge.

ENPH has confused Article V(1) of the New York Convention, which addresses procedural grounds for refusing to enforce "at the request of the [liable] party," with Article V(2)(b) of the Convention, which addresses public-policy grounds on which a court may refuse to enforce "if the [court] finds" on its own initiative that such grounds exist. N.Y. Convention, art. V; RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION § 2-16(a) (2015). As Nigeria responds, parties cannot waive their rights under Article V(2)(b) because public policy violations implicate the integrity of the enforcing court. *See Hurd v. Hodge*, 334 U.S. 24, 34-35 (1948); RESTATEMENT (THIRD) OF THE U.S. LAW OF INT'L COMMERCIAL ARBITRATION § 2-16(b) (2015). Under the PPA, the parties only waived their rights "to the fullest extent permitted by applicable law." PPA Clause 23.3.5.

The implementing statute authorizes federal courts to enforce arbitral awards under the New York Convention, 9 U.S.C. §§ 201, 207, which in turn, authorizes the enforcing court

to deny enforcement where doing so would be contrary to the public policy of the jurisdiction in which enforcement is sought, N.Y. Convention, art. V(2)(b).  This is distinct from Article V(1)'s procedural defenses, which the parties do not dispute can be waived.  *See Employers Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937, 942 (7th Cir. 1999).  Although the agreement by Nigeria and ENPH to arbitrate disputes arising under the PPA meant the interpretation of their agreement was delegated to the ICC, *see Oxford Health Plans LLC v. Sutter*, 133 S. Ct. 2064, 2070-71 (2013), "as with any contract, however, a court may not enforce . . . an agreement that is contrary to public policy."  *W.R. Grace & Co. v. Local Union 759, Int'l Union of United Rubber Workers of Am.*, 461 U.S. 757, 766 (1983).  The Supreme Court reemphasized in *W.R. Grace* that "the question of public policy is ultimately one for resolution by the courts," and thus, if enforcement of the Award based on the ICC's interpretation of the PPA violates a public policy of the United States, as Nigeria contends, then the district court was "obligated to refrain from enforcing it."  *Id.*; *see Hurd*, 334 U.S. at 34–35; *cf. Noonan v. Gilbert*, 68 F.2d 775, 776 (D.C. Cir. 1934).  The Court's analysis of the public policy issue extended not only to the arbitral award but also to the underlying contract.  *W.R. Grace*, 461 U.S. at 768-69 & n.13.

Nigeria could not waive an Article V(2)(b) public-policy defense to enforcement of the Award simply as a result of agreeing to challenge the Award only in London, where the arbitration occurred.  That would effectively negate the court's authority to deny enforcement under both Article V(2)(b) of the Convention and Section 207 of the FAA, elevating the parties' contractual choices above the fundamental need of the federal courts to protect their own integrity.

**C.**

ENPH also invokes the doctrine of forfeiture, maintaining that Nigeria failed to argue in the district court that ENPH itself had made false representations to induce Nigeria to enter the PPA, and that ENPH should be held responsible for Enron's fraud as its alter ego. Even if Nigeria did not adequately raise these arguments in the district court, *but see* Def's Mot. to Dismiss Petition at 8-13, forfeiture cannot divest the court of its duty to resolve the public policy question any more than waiver can. As this court held in *Noonan*, 68 F.2d 775, where a party had failed to make a public policy objection at trial, that objection "may not be waived by any system of pleading," and "the court itself was bound to raise [it] in the interest of the due administration of justice." *Id.* at 776 (internal quotation marks omitted). Even were a party's failure to recognize the public policy issue until appeal to imply that the alleged violation is hardly "repugnant to fundamental notions of what is decent and just," *Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981), the court must nevertheless decide the issue.

**III.**

The public policy defense under Article V(2)(b) of the New York Convention is to be construed narrowly and is available only where an arbitration award "tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property." *TermoRio S.A. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (quoting *Ackermann v. Levine*, 788 F.2d 830, 841 (2d Cir. 1986)) (internal quotation marks omitted). That heavy burden is due to the countervailing and "emphatic federal policy in favor of arbitral dispute resolution . . . . [which] applies with special force in the field of international commerce." *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985); *TermoRio,*

*S.A.*, 487 F.3d at 933; *see also Chevron Corp. v. Ecuador*, 795 F.3d 200, 209 (D.C. Cir. 2015).

Furthermore, "considerable deference" is to be afforded by the enforcing court to the arbitrator's interpretation and application of the parties' contract. *B.G. Grp. PLC v. Republic of Argentina*, 134 S. Ct. 1198, 1210 (2014); *see W.R. Grace*, 461 U.S. at 768. In addressing the public policy question at the enforcement stage, the Supreme Court has given significant weight to the arbitrator's findings of fact. *See United Paperworkers Int'l Union*, 484 U.S. at 44-45. More generally in arbitration, because the parties bargained for the ICC's construction of the PPA, the ICC's "construction holds, however good, bad, or ugly." *Oxford Health Plans LLC*, 133 S. Ct. at 2070-71. "It is not enough . . . to show that the [arbitrator] committed an error — or even a serious error." *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 671 (2010). As long as the arbitrator was "even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced [the arbitrator] committed serious error does not suffice to overturn his decision." *United Paperworkers Int'l Union*, 484 U.S. at 38.

The district court found that Nigeria "fail[ed] to establish why the [c]ourt should refrain from enforcing this international arbitral award simply because it involves an entity that was related to the Enron Corporation." Mem. Op. at 4 (Aug. 6, 2015). Nigeria had identified no basis to impute Enron's accounting fraud to ENPH merely because it was an Enron special purpose vehicle. And the ICC had determined that Nigeria failed to provide "any evidence of [accounting] fraud in connection to Phase II of the Original PPA." ICC ¶ 257.

On appeal, Nigeria's contentions have a similar flavor, maintaining that ENPH is the "offshore shell affiliate" of a

corporation that committed "one of the great financial frauds of recent years," Appellant's Br. 17, again without attempting to connect that fraud to Nigeria or Phase II of the PPA. To the extent Nigeria's contentions amount to urging that the district court's conclusion, as well as that of the ICC, about Enron's non-relationship to the PPA misses the forest for the trees, because as a special purpose vehicle ENPH was necessarily a mechanism through which Enron carried out its fraud, it still shows no error by the district court. The ICC declined to pierce the corporate veil despite Nigeria's argument that Enron and ENPH should be treated as a single enterprise under the PPA. ICC ¶ 163. Repeatedly emphasizing that Nigeria had contracted only with ENPH, *see, e.g.*, ICC ¶¶ 191-92, 201-03, the ICC noted the absence of any mention of Enron in the PPA. It also interpreted PPA Clause 31 — stating "this Agreement shall be binding upon . . . the Parties and their successors and permitted assigns, and is not intended to and shall not confer any rights or benefits on any third party not a signatory thereto" — to preclude an implied, alter-ego relationship between ENPH and non-signatory Enron. ICC ¶¶ 212-14. Nigeria baldly asserts as an "undisputable fact" that ENPH lacked staff, an office, a bank account, assets, earnings, and sufficient capital. Appellant's Br. 27. Even if true, Nigeria conveniently ignores its own concession that it had repudiated the PPA nearly two years before Enron's collapse was publically known. ICC ¶¶ 400, 404(a). Moreover, Nigeria ignores the ICC's determination that it was willing to cooperate in the completion of Phases I and III of the project. ICC ¶¶ 256-57.

This does not mean that either the district court or the ICC viewed Enron's collapse as irrelevant to Phase II of the PPA. The ICC credited the argument that ENPH was a "shell company that could not implement Phase II by itself," ICC ¶ 189, and considered Enron's bankruptcy as a mitigating factor in calculating the amount of damages, when the renegotiation

and completion of Phase II became too uncertain in Enron's absence to allow ENPH to recover expectation damages. ICC Award ¶¶ 105-09. That, however, is a separate question from whether Nigeria was fraudulently induced to execute the PPA, which the ICC found it was not, and from whether Enron's fraud and collapse had anything to do with Nigeria's anticipatory repudiation and subsequent breach of the PPA, which the ICC found it did not.

No more persuasive is Nigeria's contention that ENPH itself made false representations regarding Enron's financial strength that induced Nigeria to enter the PPA. Appellant's Br. 32-34. For instance, misrepresentations were made during the November 1999 presentation to President Obasanjo, ICC ¶¶ 239, 242, but the ICC found that these statements were irrelevant. ICC ¶ 243. Even if knowledge of the statements' falsity should be imputed to ENPH because its staff was employed by Enron, the ICC found the allegations failed for lack of materiality to Nigeria's execution of the PPA, for such statements "could have only induced [Nigeria] to enter into an agreement with Enron," not ENPH. ICC ¶ 243. As it does here, Nigeria asserted that absent these representations it never would have agreed to contract with ENPH. Appellant's Br. 33; ICC ¶ 228. The ICC was unpersuaded, finding that nine days after executing the PPA Nigeria simply had a "change of mind about the convenience of [its] bargain," ICC ¶ 408, and noting that the PPA omitted a financial guarantee by Enron or any mention of Enron's financial strength. ICC ¶ 242. Instead, the PPA provided that ENPH was free to subcontract with third-party companies to finance, design, and construct the power plant. PPA Clauses 3.1(iii), 4.2, 4.3; ICC ¶¶ 191-92.

Although the PPA was negotiated in Enron's shadow, and Nigeria seems to have believed Enron would lend its resources and backing to the electric facilities project, *see* Appellant's Br.

33-34, the question before the enforcing court is limited. *See Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012). Here, the district court had no choice other than to conclude that enforcement of the Award on Phase II is not so manifestly unjust that its confirmation would "undermine . . . the public confidence in the administration of the law." *TermoRio S.A.*, 487 F.3d at 938 (quoting *Ackermann*, 788 F.2d at 841). Accordingly, we affirm the order confirming the Award.