# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued March 17, 2025          Decided June 24, 2025

No. 24-7053

METROPOLITAN MUNICIPALITY OF LIMA,
APPELLANT

v.

RUTAS DE LIMA S.A.C.,
APPELLEE

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02155)

*David M. Lehn* argued the cause and filed the briefs for appellant.

*David G. Hille* argued the cause for appellee. With him on the brief were *Nicolle E. Kownacki*, *Blair E. Trahan*, and *Renata Rogers de Castilho*.

Before: WALKER, *Circuit Judge*, and EDWARDS and GINSBURG, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: In 2013, the Metropolitan Municipality of Lima ("Lima") and Rutas de Lima S.A.C. ("Rutas") executed a Concession Contract for the construction, improvement, and operation of urban roads in Lima, Peru. As part of the Concession Contract, Rutas agreed to finance the project and construct, improve, and operate the roads in exchange for revenue from toll units. In addition, Lima agreed to perform some preliminary activities related to the existing road infrastructure prior to Rutas's work. However, the Concession Contract permitted Rutas to perform the preliminary activities if Lima failed to do so. Between 2014 and 2016, Lima and Rutas entered into additional agreements related to the Concession Contract. Essentially, those agreements transferred Lima's obligation to perform the preliminary activities to Rutas in exchange for toll rate increases.

The project covered by the Concession Contract met with difficulties when social protests and riots broke out in Lima in response to rate increases at one of the toll units. Lima closed one of the new toll units and refused to comply with the scheduled toll rate increases at other units. In response, Rutas commenced two international arbitrations, claiming that Lima had breached its obligations under the Concession Contract. Lima, in turn, alleged that the Concession Contract and related agreements were null and void because Rutas's parent company, Odebrecht S.A. ("Odebrecht"), bribed local officials to secure the agreements.

Two arbitration tribunals rejected Lima's arguments and issued awards in Rutas's favor. Both tribunals concluded that there was insufficient evidence connecting Odebrecht's corrupt payments to the Concession Contract and related agreements. Lima filed suit in the District Court, seeking to vacate the two arbitration awards pursuant to the Federal Arbitration Act

("FAA"), 9 U.S.C. § 1 *et seq.* Rutas, in turn, cross-moved to confirm the awards.

Lima's principal claims before the District Court that are relevant to this appeal were that the awards should be vacated because: (1) confirming the awards would violate the United States' public policy against enforcing contracts obtained through corruption; (2) Rutas committed fraud during the first arbitration proceedings by falsely denying that it had documents responsive to a discovery request; and (3) the second tribunal engaged in misconduct by refusing to hear certain evidence. The District Court denied Lima's petitions to vacate the arbitration awards and granted Rutas's cross-motions to confirm the awards. *Metro. Mun. of Lima v. Rutas de Lima S.A.C.*, Nos. 20-cv-02155, 23-cv-00680, 2024 WL 1071119, at *2 (D.D.C. Mar. 12, 2024).

On appeal before this court, Lima presses claims similar to those raised with the District Court. For the reasons explained below, we affirm the judgment of the District Court. Even if the tribunals' key findings and conclusions are susceptible to scrutiny, in this case they easily withstand that scrutiny. First, we find that the District Court did not err in declining to overturn the arbitration awards based on Lima's contentions that enforcement of the Concession Contract would violate U.S. public policy. The arbitration tribunals found that Lima failed to establish that Rutas obtained the Concession Contract and other agreements through bribery and fraud. Second, the District Court did not err in rejecting Lima's claim that it was unable to present its case to the first tribunal due to Rutas's alleged false responses to discovery. Lima suffered no prejudice from the exclusion of that evidence. Finally, Lima contends that the District Court erred in rejecting its claim that the second tribunal improperly refused to admit evidence. We

reject this contention because the record does not support it. Accordingly, we affirm the District Court's judgment in full.

## I. BACKGROUND

### A. *Legal Background*

"Congress enacted the FAA to replace judicial indisposition to arbitration with a 'national policy favoring [it] and plac[ing] arbitration agreements on equal footing with all other contracts.'" *Hall St. Assocs., L.L.C. v. Mattel, Inc.*, 552 U.S. 576, 581 (2008) (alteration in original) (citation omitted). To that end, the FAA "provides for expedited judicial review to confirm, vacate, or modify arbitration awards." *Id.* at 578. And it lists four grounds for vacatur. 9 U.S.C. § 10(a). As relevant here, the FAA authorizes federal courts to vacate an arbitration award when, *inter alia*, the arbitrator is "guilty of misconduct … in refusing to hear evidence pertinent and material to the controversy" or "where the award was procured by corruption, fraud, or undue means." *Id.* § 10(a)(1), (3).

The FAA also implements the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards ("New York Convention"). *See* 9 U.S.C. §§ 201-208; *Comm'ns Imp. Exp. S.A. v. Republic of the Congo*, 757 F.3d 321, 324 (D.C. Cir. 2014). The New York Convention is a multilateral treaty that generally "obligates participating countries to honor international commercial arbitration agreements and to recognize and enforce arbitral awards rendered pursuant to such agreements." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 283 (D.C. Cir. 2016) (citation omitted). Accordingly, the FAA directs courts to confirm arbitration awards falling under the New York Convention unless they find that one of the grounds for refusing enforcement of an award applies. 9 U.S.C. § 207.

In pertinent part, the New York Convention provides that recognition and enforcement of an award may be declined if enforcement of that award would be contrary to the public policy of the country where recognition and enforcement are sought, or if a party was unable to present its case. New York Convention, art. V(1)(b), (2)(b), June 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 42.

## B. *Factual Background*

In April 2010, two Brazilian subsidiaries of Odebrecht formed the Líneas Viales de Lima Consortium ("Consortium") in Lima, Peru. Shortly thereafter, the Consortium submitted the Vías Nuevas de Lima Private-Sector Initiative Proposal ("PSI Proposal") to Lima for the design, construction, operation, and maintenance of new and existing urban roads in Lima. The parties negotiated over the next two years. The Consortium submitted various versions of the PSI Proposal to Lima, culminating in a fifth and final version in March 2012. One month later, an external consulting firm confirmed that the latest PSI Proposal incorporated Lima's requests and complied with the applicable legal frameworks. Around the same time, Lima's Municipal Council issued a formal declaration of public interest regarding the PSI Proposal, requesting that interested third parties express their interest in the execution of the same or an alternative project within 90 days. But none did. Accordingly, Lima awarded the PSI Proposal project to the Consortium in September 2012. By that time, the Consortium had been incorporated and renamed Rutas de Lima S.A.C. During the relevant period, Odebrecht was Rutas's majority shareholder.

In January 2013, Lima and Rutas entered into the Concession Contract, which, *inter alia*, implemented the PSI Proposal and established a rate system for the roads. In a

nutshell, the parties agreed that Rutas would construct, improve, and operate the roads with its own resources and financing in exchange for receiving the toll proceeds. Lima also consented to performing certain preliminary activities before Rutas's work, such as ensuring that the preexisting roads met specific serviceability conditions. The Concession Contract further provided that Rutas would perform those preliminary activities for additional compensation if Lima was unable to execute that work.

Significantly, while the parties negotiated and signed the Concession Contract, Lima's then-mayor, Susana Villarán de la Puente ("Villarán"), faced a mayoral recall referendum. This process started with Lima's Citizen Initiative Committee submitting signatures of people supporting Villarán's recall to the National Office of Vital Records in April 2012. The National Elections Office then submitted the recall referendum request to the National Elections Tribunal in October 2012; a few days later, the National Elections Tribunal called for a referendum on the recall to be held in March 2013. Villarán ran an anti-recall campaign and ultimately survived the recall. Overall, Odebrecht contributed $3 million to her anti-recall campaign. Villarán unsuccessfully ran for reelection in 2014.

In February 2014, Lima and Rutas signed the Bankability Addendum to the Concession Contract. This addendum provided that Rutas, rather than Lima, would perform the preliminary activities assigned to Lima in the Concession Contract, and it established a compensation mechanism for that work. In December 2015, the parties signed a memorandum of agreement ("2015 Memorandum of Agreement"), in which Lima agreed to compensate Rutas for the preliminary work through toll rate increases. In June 2016, the parties signed another memorandum of agreement ("2016 Memorandum of

Agreement"), in which Lima agreed to increase the scheduled toll rates outlined in the 2015 Memorandum of Agreement.

A few months later, the U.S. Government and Odebrecht entered into a plea agreement, in which Odebrecht pleaded guilty to conspiracy to commit offenses against the United States – namely, to violate the anti-bribery provisions of the Foreign Corrupt Practices Act. As relevant here, Odebrecht admitted that, between 2005 and 2014, it had paid $29 million in bribes to government officials in Peru to obtain public works contracts. However, the plea agreement did not mention Rutas or the Vías Nuevas de Lima project.

In January 2017, after Lima and Rutas implemented the toll rate increase at the New Chillón Toll Unit, social protests and riots occurred. Consequently, Rutas was unable to collect tolls at the New Chillón Toll Unit and Existing Chillón Toll Unit. And Lima subsequently suspended the New Chillón Toll Unit.

During that same year, more disagreements arose between Lima and Rutas regarding other toll units. Specifically, in December 2017, Lima requested that Rutas forego the stipulated toll increase at other toll units due to its concern about future social protests. Although Rutas agreed to temporarily suspend the scheduled rate increases, Lima later claimed that the increases were unwarranted because Rutas had failed to complete the required preliminary work covered by the Concession Contract. After Rutas continued implementing the toll rate increases, Lima attempted to invalidate Rutas's actions by filing claims in Peruvian courts.

Following failed negotiations with Lima regarding the New Chillón Toll Unit and Existing Chillón Toll Unit, Rutas initiated the First Arbitration in May 2018. Rutas sought, *inter*

*alia*, damages for lost toll revenues at those units. Lima, in turn, claimed that the tribunal could declare, on its own authority, that the Concession Contract and amendments were null and void because Rutas obtained those agreements through Odebrecht's bribery and corruption. In particular, Lima argued that Rutas secured the Concession Contract because Odebrecht bribed Lima's then-mayor, Villarán – principally, by contributing to her anti-recall campaign in late 2012 and early 2013. In addition, Lima alleged that Rutas secured the Bankability Addendum because Odebrecht made two payments in 2014 to Lima's then-municipal manager, José Miguel Castro Gutiérrez ("Castro"). As evidence, Lima primarily relied on investigatory reports and the testimony of Jorge Miguel Ramírez ("Ramírez"), the public prosecutor in Peru for the Odebrecht case. For instance, one report referred to the Odebrecht payroll, which included an entry titled "Concessão Rutas de Lima" from February 2014 adjacent to two payments to a person identified with the code "Budián." Budián was Castro's codename in ledgers.

The First Arbitration was held in Washington, D.C., and conducted under the United Nations Commission on International Trade Law ("UNCITRAL") rules. During the discovery phase of the proceedings, Lima requested from Rutas documents in its possession containing analysis, mention, or discussion of payments from Rutas to employees and officials of the government of Lima (Document Request No. 19). However, the tribunal denied this request after Rutas asserted that it was unaware of any such documents.

In May 2020, the first tribunal issued an arbitration award in Rutas's favor and granted Rutas damages for failed rate collection at the Existing Chillón Toll Unit and New Chillón Toll Unit. Applying a preponderance of the evidence standard, the tribunal found that there was insufficient evidence to link

Odebrecht's corrupt payments to the Concession Contract and its amendments.

First, the tribunal explained that Lima awarded the PSI Proposal project to Rutas in September 2012, which was before the National Jury of Elections organized the recall referendum; as such, it determined that there was no evidence that Rutas secured the project through bribes to the anti-recall campaign. It also noted that the Concession Contract's terms were not more favorable to Rutas than those already provided for in the Declaration of Interest for the PSI Proposal.

Second, the tribunal concluded that Odebrecht's two payments to Castro in February 2014 did not establish adequate evidence of corruption because the payments were made more than two years before the execution of the 2016 Memorandum of Agreement and more than one year after the execution of the Concession Contract. Likewise, the tribunal did not find sufficient evidence linking the payments to the Bankability Addendum and 2015 and 2016 Memoranda of Agreement because the Concession Contract already provided a mechanism for Rutas to perform the preliminary work in Lima's stead, and there was no evidence that Rutas received any undue benefits (*i.e.*, inflated prices) in the amendments. Instead, the tribunal emphasized that the Bankability Addendum created more onerous conditions for Rutas by shortening the time for completing the preliminary activities.

Third, the tribunal observed that the testimony of Odebrecht's representative, Jorge Henrique Simoes Barata ("Barata"), confirmed that the payments to Villarán's anti-recall campaign did not impact the validity of the Concession Contract. In particular, Barata denied that Odebrecht's payments to Villarán's anti-recall campaign were made to aid

Rutas with the Concession Contract because that contract had already been assigned.

Fourth, the tribunal cast doubt on Prosecutor Ramírez's testimony because he was unable to proffer specific information to confirm that the Concession Contract or amendments were stained by acts of corruption.

Nevertheless, the legal fight between Rutas and Lima did not end there. In March 2019, Rutas commenced the Second Arbitration, seeking damages from Lima's refusal to implement the 2017 and 2018 toll rate increases. This arbitration was also seated in Washington, D.C. and conducted under the UNCITRAL rules. For its part, Lima again claimed that the Concession Contract and amendments were void because of bribery and corruption. As support, Lima primarily relied on the testimony of Castro and Special Prosecutor Rafael Ernesto Vela Barba, and documents from the ongoing criminal investigation into Villarán and others. Notably, Lima contended that the prosecution's evidence showed that Odebrecht and Rutas illegally financed Villarán's reelection campaign by Rutas entering into fictitious contracts [hereinafter "Meiggs Contracts"] with César Meiggs's company, known as Generación S.A., to funnel the campaign contributions. According to Lima, the purpose of the bribes was for Rutas to gain additional benefits under the Concession Contract, which resulted in the Bankability Addendum.

Over the course of the proceedings, Peruvian prosecutors eventually filed an indictment against Villarán and others for alleged crimes, such as illicit association and collusion. Lima claimed that the crimes were related to the Concession Contract and sought to introduce "the relevant documents" as evidence. Joint Appendix ("J.A.") 356. The tribunal initially denied this request. But it later permitted Lima to introduce portions of the

indictment, without additional annexes or writings, relating to an alleged route of illicit money that was delivered by Odebrecht.

In December 2022, the second tribunal issued an arbitration award in Rutas's favor and granted Rutas lost-profit damages. Applying a "flexible balance of probabilities standard," the second tribunal reached the same conclusion as the first tribunal regarding Lima's claims of corruption. J.A. 193. While the tribunal recognized that the undisputed evidence showed that Odebrecht bribed public officials in Peru and contributed $3 million to Villarán's anti-recall campaign, it nonetheless found that the evidence did not sufficiently show that such payments were made as quid pro quo for the award of the PSI Proposal project or for the execution of the Concession Contract and other agreements. Likewise, the tribunal concluded that although Rutas might have been used as a vehicle to finance Villarán's reelection campaign, there was still insufficient evidence of quid pro quo for the relevant agreements.

First, the tribunal observed that Lima awarded the project to Rutas before any meetings between Barata and Castro to arrange Odebrecht's payments to the anti-recall campaign occurred in late 2012 and early 2013. It also noted that Lima failed to provide evidence showing that Peruvian law allowed the mayor to unilaterally suspend or prevent the execution of a contract that had already been awarded. The tribunal, therefore, concluded that Odebrecht had no reason to bribe officials to officially secure the execution of the Concession Contract since Lima had already awarded the project to Rutas.

Second, the tribunal explained that the negotiations and revisions of the PSI Proposal and the consulting firm's verification that the proposal complied with legal requirements

occurred before April 4, 2012, which was when the Citizen Initiative Committee requested a recall referendum for Villarán. It further reasoned that the approval process for the proposal – which continued to occur after April 4 – followed the relevant law. Accordingly, the tribunal found that there was insufficient evidence to connect the recall process to the Municipal Council's approval of the PSI Proposal.

Third, as to the Bankability Addendum, the tribunal noted that the Concession Contract already provided for the possibility that Rutas could perform the preliminary work in Lima's stead. It also stressed that Lima failed to present evidence of any additional benefits that Rutas received from the Bankability Addendum. The tribunal acknowledged gaps in the evidence concerning the parties' reasoning for transferring the responsibility for the preliminary activities to Rutas. However, it identified other potential legitimate reasons for the transfer, such as Lima's failure to act with diligence in satisfying its obligations. Overall, the tribunal found that Lima failed to show that Odebrecht's payments to the anti-recall campaign in February 2014 were quid pro quo for the Bankability Addendum.

Fourth, the tribunal rejected Lima's claim that Rutas procured the 2015 and 2016 Memoranda of Agreement through corruption. Because Lima did not present independent evidence of corruption for those agreements and there was insufficient evidence showing that the Concession Contract and Bankability Addendum were obtained through corruption, the tribunal reasoned that the 2015 and 2016 Memoranda of Agreement were not tainted by corruption.

Fifth, the tribunal highlighted significant issues with Lima's evidence. Namely, the tribunal found that the Prosecution Office did not provide all non-privileged and non-

confidential documents presented to the Peruvian criminal courts, that several documents containing witness statements were excerpts without the full transcripts, and that some of the transcripts were uncorroborated statements from prospective cooperating defendants. In addition, the tribunal did not find Castro's testimony credible due to his inconsistent statements, lack of detailed knowledge of the agreements, and partial reliance on press reports for information. For example, the tribunal criticized Castro's reliance on inconclusive press reports discussing Odebrecht's alleged payments to the 2010 mayoral campaign of Municipal Councilwoman Lourdes Flores Nano ("Flores") for his claim that Lima approved the PSI Proposal because of bribes. By contrast, the tribunal found Barata's testimony credible – specifically, his admission that Odebrecht bribed officials for other projects but did not do so to secure the Concession Contract.

## C. *Procedural History*

Lima subsequently filed an action in the District Court to vacate the first and second arbitration awards. Rutas cross-moved to confirm both awards. Lima principally argued that the awards should be vacated under the FAA or not confirmed under the New York Convention because enforcing the awards would violate the U.S. public policy against enforcing contracts procured through corruption.

As noted above, the District Court denied Lima's petitions to vacate the first and second arbitration awards and granted Rutas's cross-motions to confirm the two awards. *Metro. Mun. of Lima*, 2024 WL 1071119, at *2. The court rejected Lima's claims that it should vacate the awards on public policy grounds. *See id.* at *18, *25. Specifically, it found that Lima's claims had to be determined exclusively by the arbitrators because Lima alleged that the underlying contract, rather than

the arbitration award, was invalid for violating public policy. *Id.*

As to the first arbitration award, the court also rejected Lima's contention that it should vacate the award because Rutas committed fraud by denying that it had responsive documents for Document Request No. 19. *See id.* at *16-17. In particular, the court reasoned that there was no clear and convincing evidence that Rutas withheld documents concerning sham contracts and invoices used to funnel money to Villarán's campaign. *Id.* at *17. In the court's view, the so-called Meiggs Contracts were not on their face responsive to the request. *Id.* The court also concluded that the documents would not have been material to the first tribunal because the second tribunal considered the Meiggs Contracts and other evidence, yet it still dismissed Lima's argument of quid pro quo. *Id.* at *18.

With respect to the second arbitration award, the court rejected Lima's claim that it should vacate the award because the tribunal deprived it of a fair hearing by improperly excluding the annexes and writings accompanying Villarán's indictment. *Id.* at *20-21, *24. Specifically, the court found that Lima never requested for the tribunal to admit such documents. *Id.* at *20. Furthermore, the court determined that Lima did not suffer any prejudice from the exclusion of those materials. *Id.* at *23-24. It explained that the annexes did not address the critical flaw with the evidence in the indictment – that is, the lack of evidence that the bribes to Villarán's campaign were made as consideration for the execution of the Concession Contract and related agreements. *Id.* at *23.

Lastly, the court confirmed the first and second arbitration awards under the New York Convention because Lima's

arguments opposing confirmation mirrored its unsuccessful arguments for vacatur. *Id.* at \*19, \*25.

## II. ANALYSIS

### A. *Standard of Review*

"[J]udicial review of arbitral awards is extremely limited, and we do not sit to hear claims of factual or legal error by an arbitrator as we would in reviewing decisions of lower courts." *Kurke v. Oscar Gruss & Son, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (cleaned up) (citations omitted). In addressing whether enforcement of an award should be denied on public policy grounds, we give at least "substantial deference" to the arbitrator's interpretation of the agreement, and "significant weight to the arbitrator's findings of fact." *Enron*, 844 F.3d at 283, 289. In addition, we review *de novo* a district court's order refusing to vacate an arbitration award under the FAA. *Selden v. Airbnb, Inc.*, 4 F.4th 148, 155 (D.C. Cir. 2021). And we review "a district court's confirmation of an arbitration award for clear error as to findings of fact and *de novo* as to questions of law." *Lessin v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 481 F.3d 813, 816 (D.C. Cir. 2007) (citation omitted).

### B. *Enforcement of the Arbitration Awards Does Not Violate U.S. Public Policy.*

First, Lima argues that both arbitration awards should be vacated and not confirmed because enforcing the Concession Contract would violate the U.S. public policy against enforcing public contracts obtained through bribery and corruption. We disagree. As the arbitrators recognized, there is insufficient evidence linking Odebrecht's bribes to the Concession Contract, Bankability Addendum, and 2015 and 2016 Memoranda of Agreement.

As an initial matter, we note that we have previously recognized non-statutory grounds for vacating an arbitration award under the FAA, where the award "is in manifest disregard of the law or is contrary to an explicit public policy." *Id.* (internal quotation marks and citations omitted). However, in *Hall Street*, the Supreme Court held that section 10 of the FAA provides the "exclusive grounds" for vacatur of arbitration awards. 552 U.S. at 584. That said, the Supreme Court and this court have declined to decide whether the non-statutory grounds for vacatur survived *Hall Street*. *See Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 672 n.3 (2010); *Selden*, 4 F.4th at 160 n.6. Because the record before us plainly shows that Lima failed to establish that Rutas obtained the Concession Contract and other agreements through bribery, it is unnecessary for us to decide whether public policy remains a viable and independent ground for vacatur under the FAA. *See Selden*, 4 F.4th at 160 n.6 (adopting a similar approach). Nor is it necessary to assess the District Court's view that arbitral tribunals exclusively determine whether an underlying contract is invalid for violating public policy. *See Commodities & Mins. Enter. Ltd. v. CVG Ferrominera Orinoco, C.A.*, 49 F.4th 802, 818-19 (2d Cir. 2022).

In this case, the District Court thoroughly reviewed and explained the findings and analyses of the arbitral tribunals relating to Lima's corruption claims. *See Metro. Mun. of Lima,* 2024 WL 1071119, at *4-9. Furthermore, in addressing Lima's arguments, the District Court observed that the tribunals thoroughly reviewed all of Lima's evidence and found the evidence insufficient to link the alleged bribery and fraud to the Concession Contract and related agreements. *See id.* at *13, *16. We agree with the District Court that we have no basis here to overturn the arbitration awards on public policy grounds. Even if the tribunals' key conclusions regarding the

insufficiency of the evidence are susceptible to scrutiny, they easily withstand that review here. Indeed, those conclusions are amply supported by the record. And, as explained above, we give "significant weight" to the arbitrator's factual findings. *Enron*, 844 F.3d at 289; *see also United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 45 (1987) ("The parties did not bargain for the facts to be found by a court, but by an arbitrator chosen by them …. Nor does the fact that it is inquiring into a possible violation of public policy excuse a court for doing the arbitrator's task.").

Tellingly, the tribunals identified temporal gaps between Odebrecht's payments to Villarán's anti-recall campaign, and Lima's award of the PSI Proposal project to Rutas, that undermined Lima's claims. For example, before the initiation of the recall referendum process, Rutas had already submitted the final version of the PSI Proposal to Lima and an external consulting firm had attested that the proposal complied with the applicable legal requirements. In addition, Lima awarded the project to Rutas before the National Elections Tribunal formally organized the recall referendum. Further, the meetings arranging the bribes to Villarán's campaign did not occur until after Lima awarded the project to Rutas. Importantly, the Concession Contract implemented the PSI Proposal and did not contain more favorable terms. As such, the tribunals reasonably concluded that there was insufficient evidence connecting Odebrecht's payments to the anti-recall campaign to the Concession Contract.

Moreover, the tribunals found that Lima's failure to identify any additional benefits that Rutas gained from the Bankability Addendum and 2015 and 2016 Memoranda of Agreement, weakened Lima's claims. To be sure, Lima offered evidence of Odebrecht's ledgers that showed payments to Castro in February 2014, and of Odebrecht's use of fictitious

contracts to contribute to Villarán's reelection campaign in 2014. Nonetheless, the Concession Contract already provided for the possibility that Rutas could perform the preliminary work instead of Lima for additional compensation. And Lima failed to point to any undue benefits that Rutas received in the other agreements. Accordingly, the tribunals reasonably determined that those payments were not likely quid pro quo for the execution of the Bankability Addendum and 2015 and 2016 Memoranda of Agreement.

Lima's arguments to the contrary lack merit. Specifically, Lima attempts to overcome the temporal gap by highlighting evidence of Odebrecht's illegal payments to Flores in 2010. For example, Horacio Cánepa Torre, Flores's campaign manager, testified to Peruvian prosecutors that Odebrecht made payments to Flores's mayoral campaign with the understanding that she would support the PSI Proposal. In Lima's view, such evidence temporally connects Odebrecht's bribes to the Concession Contract because it demonstrates that Odebrecht paid Flores's campaign to obtain approval of the PSI Proposal from opposition councilmembers. However, Lima concedes that, at the time of the arbitrations, the only evidence of these payments presented to the arbitrators were Castro's statements, supported by press reports. And, as discussed above, the second tribunal did not find Castro's reliance on the press reports persuasive because he did not personally witness any of the alleged wrongdoing, Lima did not submit evidence of any government investigations into the municipal councilmembers, and the reports were inconclusive. Moreover, as the District Court found, all the "new evidence" offered by Lima suffered from deficiencies that made it largely unreliable. *See Metro. Mun. of Lima*, 2024 WL 1071119, at *14. The District Court concluded that it would "not rely on such a ramshackle record to re-weigh the evidence or review the merits of decisions made

by two arbitral tribunals." *Id.* We, too, agree that Lima's new evidence is inadequate to overturn the arbitration awards.

In sum, we find that the District Court did not err in refusing to vacate the arbitration awards based on Lima's claims that enforcement of the Concession Contract and other agreements would violate public policy.

## C. *Lima Was Not Prevented from Presenting Its Case to the First Tribunal.*

Second, Lima argues that the first arbitration award cannot be confirmed under the New York Convention because Rutas's fabricated response to a discovery inquiry left Lima unable to present its case. In Lima's view, the tribunal prevented it from taking discovery on the issue of illegal payments to Villarán's campaign. In support of this claim, Lima contends that Rutas falsely stated that it was unaware of documents responsive to Lima's request for materials concerning payments by Rutas to employees or officials of Lima, that the Meiggs Contracts were responsive documents in Rutas's possession, and that Rutas's actions materially impacted the first tribunal's factfinding. We see no merit in these claims.

Courts may deny enforcement of an arbitration award if "[t]he party against whom the award is invoked was . . . unable to present his case." New York Convention, art. V(1)(b). At bottom, arbitrators "must provide a fundamentally fair hearing." *Generica Ltd. v. Pharm. Basics, Inc.*, 125 F.3d 1123, 1130 (7th Cir. 1997) (citations omitted); *see also Howard Univ. v. Metro. Campus Police Officer's Union*, 512 F.3d 716, 721 (D.C. Cir. 2008) (requiring the same when a litigant claims, under the FAA, that an arbitrator is guilty of misconduct in refusing to hear evidence). "'[E]very failure of an arbitrator to receive relevant evidence does not constitute misconduct

requiring vacatur.'" *Selden*, 4 F.4th at 160 (citation omitted). Rather, "we vacate the award only if the failure 'prejudices the rights of the parties.'" *Id.* (citation omitted). In other words, the party seeking vacatur "must establish that (1) the arbitrator committed some error, and (2) the error made a difference." *Id.*

The problem with Lima's argument is that it cannot show actual prejudice from the alleged exclusion of the Meiggs Contracts from evidence. Tellingly, Lima presented this evidence to the second tribunal, yet the tribunal nevertheless determined that Lima had failed to establish that Odebrecht's illegal payments were quid pro quo for the Concession Contract and other agreements. *See* J.A. 188-89 ("Rutas de Lima might have been used as a vehicle for transferring the funds intended to finance Susana Villarán's reelection campaign, by apparently entering into fictitious contracts with Generación S.A …. [But] there is not sufficient evidence to conclude that such payments were made as a quid pro [quo]…." (cleaned up)). Due to the absence of prejudice, Lima has failed to show that it was unable to present its case to the first tribunal.

Accordingly, the District Court correctly rejected Lima's claim and denied vacatur on this ground.

## D. *The Second Tribunal Did Not Refuse to Hear Pertinent and Material Evidence.*

Finally, Lima contends that the second arbitration award must be vacated because the tribunal's exclusion of the annexes to Villarán's indictment denied fair process to Lima. We disagree.

Courts may vacate an arbitration award "where the arbitrators were guilty of misconduct … in refusing to hear

evidence pertinent and material to the controversy." 9 U.S.C. § 10(a)(3). To warrant vacatur, Lima must establish that the second tribunal committed an error. *See Selden*, 4 F.4th at 160. However, Lima cannot do so. The District Court concluded that the tribunal never refused to admit the annexes, and we discern no clear error. Indeed, the correspondence between Lima and the tribunal repudiates Lima's argument.

The sequence of events unfolded as follows. Lima informed the tribunal about Villarán's indictment and then requested authorization to incorporate the "relevant documents" when it obtained them. J.A. 356. After the tribunal denied this initial request, Lima subsequently requested reconsideration of the decision and sought to introduce the indictment document. Importantly, Lima did not mention any annexes to the indictment document. Following the tribunal's denial of Lima's request, Lima responded that the filing of the indictment itself was probative on several points, including to controvert Rutas's arguments about the lack of an indictment. Moreover, Lima stressed that the indictment corroborated its allegations, which could thereafter be confirmed by "the mere fact of the filing of the Indictment and on the relevant pages of the document." *Id.* at 358. It then "reiterate[d] its request to include the Indictment in the file." *Id.*

This exchange demonstrates that the tribunal reasonably concluded that Lima's request for admission of evidence pertained to the indictment document itself rather than the annexes accompanying the indictment. As such, the District Court appropriately denied Lima's claim that the second tribunal improperly refused to admit evidence.

### III. Conclusion

For the reasons set forth above, we affirm the District Court's judgment.

*So ordered.*