# United States Court of Appeals
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

———

Argued February 23, 2026        Decided June 12, 2026

No. 25-7096

VENEZUELA US SRL,
APPELLEE

v.

BOLIVARIAN REPUBLIC OF VENEZUELA,
APPELLANT

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:22-cv-03822)

———

*Juan O. Perla* argued the cause for appellant. With him on the briefs were *David V. Holmes* and *Joseph D. Pizzurro*.

*John M. Conlon* argued the cause for appellee. With him on the brief were *Kevin B. Weehunt, Jr.* and *Michael P. Lennon, Jr.*

Before: RAO and WALKER, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the court filed by *Senior Circuit Judge* RANDOLPH.

Dissenting opinion filed by *Circuit Judge* WALKER.

RANDOLPH, *Senior Circuit Judge*:

Venezuela US, S.R.L. ("VUS"), a Caribbean company based in Barbados, obtained an award of damages against the Bolivarian Republic of Venezuela ("Venezuela") in an international arbitration conducted pursuant to the Arbitration Rules of the United Nations Commission on International Trade Law. This is an appeal from the judgment of the district court granting VUS's petition for recognition and enforcement of that award.

The United States, as a member of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, agreed that our courts would recognize and enforce foreign arbitral awards pursuant to the Convention done at New York June 10, 1958; T.I.A.S. No. 6997 (Dec. 29, 1970). Congress codified the New York Convention in the Federal Arbitration Act. *See* 9 U.S.C. §§ 201-08. The Federal Arbitration Act requires a domestic court to confirm a foreign arbitral award "unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the [New York Convention]." *Id*. 9 U.S.C. § 207. One such ground is the so-called "public policy exception" in Article V(2)(b), which permits the competent authority of a member country to refuse recognition when "[t]he recognition or enforcement of the award would be contrary to the public policy of that country."

## I.

In 2006, VUS acquired an 18 percent stake in Petroritupano, S.A., a Venezuelan *empresa mixta*, or "mixed company" that owned the rights to oil production in a

particular area of Venezuela. The two other shareholders were a Venezuelan state-owned company and the subsidiary of a Brazilian state-owned company. After profitable years of business in 2008 and 2009, the shareholders voted to pay themselves dividends. Although the state-owned shareholders collected, VUS received nothing.

In 2013, VUS initiated arbitration proceedings against Venezuela in The Hague, Netherlands. The arbitration tribunal trifurcated the proceeding into a preliminary jurisdictional phase, a merits phase,[1] and a damages phase. At the time, Nicolás Maduro was President of Venezuela; and the Maduro Regime was the U.S.-recognized government of the country; and the law firm of Curtis, Mallet-Prevost, Colt & Mosele LLP was representing Venezuela in the arbitration.

In 2016, the first phase concluded when the Tribunal determined that Venezuela had consented to arbitrate the dispute with VUS. In February 2018, the parties finished their submissions for the second phase of the arbitration, and the Tribunal began to deliberate. In May 2018, as the arbitration proceedings dragged on, Venezuela held a presidential election. Incumbent President Maduro claimed victory. The National Assembly[2] disputed his claim. Maduro refused to

---

[1] For the sake of accuracy, we note that the second phase also included some leftover jurisdictional issues, irrelevant to this appeal.

[2] The National Assembly is the legislative branch of the Venezuelan government, which consists of a single chamber of approximately 277 popularly elected deputies. *See* Luis Bergolla, *An Introduction to Venezuelan Governmental Institutions and Primary Legal Sources*, NYU L. GLOBALEX, (Mar.-Apr. 2022), https://www.nyulawglobal.org/globalex/venezuela1.html.

concede. On January 23, 2019, the National Assembly declared the election results invalid and selected an Interim President, Juan Guaidó, then the head of the Assembly. On the same day President Donald J. Trump officially recognized Juan Guaidó as the "Interim President of Venezuela." In doing so, President Trump found the Assembly to be the only legitimate branch of government. Even so Maduro remained in power.

In June 2020, while awaiting the results of the jurisdictional and merits phases of the arbitration, the Maduro-led government replaced the Curtis firm with Guglielmino & Associados S.A., an Argentina-based law firm.[3] Since briefing had already concluded, the Guglielmino firm did not substantively participate in this phase of the arbitration. In February 2021, the Tribunal dismissed Venezuela's jurisdictional challenge and ruled that Venezuela was liable to VUS. The Interim Government of Venzuela did not attempt to intervene and challenge the replacement of the firm. [JA85]. The Guiglielmino firm thus proceeded to present Venezuela's case in the damages phase. In November 2022, after completing the damages phase, the Tribunal awarded VUS $59 million, plus costs, attorney fees and interest.

---

[3] The Curtis firm is representing the Interim Government of Venezuela in this appeal. There is some dispute over the circumstances of its replacement in the arbitration. VUS suggests that the Curtis firm was fired. The firm asserts that it refused to take instruction from the Maduro Regime after the U.S. President recognized the Interim Government. JA64, JA85. Why the firm departed has no bearing on this appeal.

VUS filed this action in the district court seeking recognition and enforcement of the damages award. Venezuela objected, claiming that recognizing or enforcing the award would violate U.S. public policy.

Venezuela's argument in the district court, and its argument on appeal, is that the Tribunal, in permitting the Maduro regime to change counsel, treated Maduro as if he were the legitimate President of Venezuela. Thus, for the district court to recognize and enforce the damages award would be tantamount to contradicting President Trump's exercise of his power to recognize a foreign government.

The district court granted VUS's petition. The court ruled that the Executive's recognition power was not a cognizable public policy under the New York Convention and that even if it were, judicial recognition and enforcement of the award here would not contradict it. *Venezuela US SRL v. Bolivarian Republic of Venezuela*, 789 F. Supp. 3d. 1 (D.D.C. 2025).

## II.

Consistent with the "emphatic federal policy in favor of arbitral dispute resolution," judicial review of arbitral awards of this sort is limited. *Belize Soc. Dev. Ltd. v. Gov't of Belize*, 668 F.3d 724, 727 (D.C. Cir. 2012) (citing *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)). The public policy exception in Article V(2)(b) of the New York Convention is "construed narrowly" and applied only when an award "tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property." *Enron Nigeria Power Holding, Ltd. v. Fed. Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016)

(cleaned up). Recognition or enforcement of the award must be "repugnant to the fundamental notions of what is decent and just" in the United States, *c.f. Tahan v. Hodgson*, 662 F.2d 862, 864 (D.C. Cir. 1981) (quoting RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 117, comment c (1971)), and must violate this nation's "most basic notions of morality and justice," *TermoRio S.A. E.S.P. v. Electranta S.P.*, 487 F.3d 928, 938 (D.C. Cir. 2007) (cleaned up); *see also BCB Holdings Ltd. v. Gov't of Belize*, 650 F. App'x 17, 19 (D.C. Cir. 2016).

The Constitution gives the President the exclusive power to grant formal recognition to foreign governments. *See* U.S. CONST. art. II §§ 2, 3; *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1 (2015). Formal recognition is an acknowledgment that "a particular regime is the effective government of a state." *Zivotofsky*, 576 U.S. at 11 (cleaned up). The President's recognition of a particular regime is "conclusive on all domestic courts, which are bound to accept that determination." *Guaranty Trust Co. v. United States*, 304 U.S. 126, 138 (1938).

We need not decide whether the President's recognition authority is a cognizable public policy under the New York Convention or whether recognition and enforcement of an arbitral award could ever violate that authority. Venezuela's appeal rests on a single proposition: that recognizing and enforcing this arbitral award would infringe on the President's exclusive recognition power. Our court rejected that very proposition in *Valores Mundiales, S.L. v. Bolivarian Republic of Venezuela, Ministerio del Poder Popular para Relaciones Exteriores*, 87 F.4th 510, 522 (D.C. Cir. 2023).

In *Valores*, the Interim Government of Venezuela unsuccessfully sought to replace counsel appointed by the Maduro Regime in a proceeding before a different arbitration tribunal – the International Centre for the Settlement of Investment Disputes ("ICSID") Arbitral Tribunal and Annulment Committee. 87 F.4th at 513-14. When the victorious Spanish claimants sought to have their ISCID awards enforced in the United States, Venezuela argued that doing so would contravene the Executive's exclusive recognition power by recognizing the Maduro Regime. *Id*. at 514.

In affirming the district court's decision in *Valores*, we rejected Venezuela's claim that enforcing those arbitral awards against it was "equivalent to recognition of the Maduro [R]egime." *Id*. at 521. We held that recognizing the awards "express[ed] no opinion" on the arbitral tribunal's decision to allow the attorneys retained by the Maduro Regime to continue representing Venezuela in the proceeding. *Id.* at 522. We wrote that neither the treaty nor the implementing statute "undermine[] the authority of the President of the United States." *Id*. at 521.

Venezuela insists that *Valores* is not controlling because it dealt with awards enforced pursuant to a different treaty (the ICSID Convention) and that treaty lacked a public policy exception. This is true, as the district court acknowledged. *Venezuela US SRL*, 789 F. Supp. 3d at 12. But even if the President's constitutional recognition power is a cognizable public policy under the New York Convention, the Federal Arbitration Act would still compel us to recognize the damages award if doing so would not violate the policy. On that front, the precedent of *Valores* is relevant, well-reasoned, convincing, and binding.

Recognition and enforcement of the damages award against Venezuela does not undermine the President's authority. *Valores*, 87 F.4th at 521. The district court expressed no opinion regarding whether the Tribunal correctly allowed the change in counsel before the damages phase. Recognition of the damages award is not a "formal acknowledgment" or "express . . . declaration" that the Maduro Regime was the "effective government" of Venezuela. *Id.* at 522 (quoting *Zivotofksy,* 576 U.S. at 11). "[E]nforcement of the [damages award here does not] imply a denial of the President's recognition of" what was then "the Guaidó government." *Id.* at 522. The district court's decision to grant the petition for enforcement "cannot seriously be seen as an attempt by a court to 'aggrandiz[e] its power at the expense of another branch.'" *Id.* (quoting *Zivotofsky*, 576 U.S. at 31-32). And "nothing in our enforcement of the [damages award] forces the Executive to contradict his statements recognizing the Guaidó regime." *Id.* (citing *Zivotofsky*, 576 U.S. at 30). In fact, unlike in *Valores*, the Interim Government in this arbitration made no attempt to replace the Maduro regime's chosen counsel with its own. The Tribunal here never had to choose one purported government over another. Thus, in this case the connection between recognizing the damages award and contradicting the President's recognition power is more tenuous here than in *Valores*.

All that we decide is that the district court correctly determined that no exception in the New York Convention permitted it to refuse to recognize and enforce this damages award.

\* \* \*

This is our response to the dissent.

In the district court and in our court Venezuela invoked one, and only one, New York Convention "public policy" objection to enforcement of the arbitration award. Venezuela's objection,[4] which we reject for reasons already given, was that enforcement would violate United States "public policy" concerning the President's constitutional authority to recognize foreign governments.

The dissenting opinion goes off on a tangent of its own devising. It contends that we must decide an entirely different "public policy" question, a question neither Venezuela nor VUS ever raised or argued or subjected to evidentiary development in pleadings or proceedings in the district court or on appeal in our court.

The question the dissent chooses to answer is whether a United States "public policy" bears on a foreign nation's representation in an international arbitration conducted in the Netherlands.

Counsel for Venezuela could hardly be faulted for failing to advance such a theory in federal court. The proverbial man on the street, if asked whether the United States had any such "public policy," would furrow his brow, mutter "surely not,"

---

[4] From the beginning of this lawsuit Venezuela has been clear. In the district court it responded this way to VUS's petition for recognition and enforcement: "The public policy at issue here is the U.S. Executive's exclusive power to recognize foreign governments—a fundamental principle . . .." *Memorandum in Opposition to Petition to Recognize and Enforce a Foreign Arbitral Award* at 1*, Venezuela US SRL v. Bolivarian Republic of Venezuela,* No. 22-cv-3822 (D.D.C. Dec. 11, 2023), ECF 20. It maintained this position in its oral argument in our court. *See* Oral Arg. Tr. 16-17.

and walk away—more quickly still when the interviewer mentioned "Franz Bonaventura Adalbert Maria Herzog von Bayern." Dissenting Op. at 1.

The fallacies in the dissent's analysis are more than a few. Here are some.

1. As we have stated, the dissent's analysis is wholly untethered from any arguments Venezuela advanced in the district court or on appeal. Citing *Enron Nigeria*, the dissent claims in a footnote that this does not matter. Dissenting Op. at 24 n.83. But the *Enron Nigeria* court held only that it would consider Nigeria's "public policy" defense to an arbitration award presented for the first time on appeal. 844 F.3d at 289. That is not the situation in this case. Venezuela has not raised the dissent's "public policy" objections even on appeal. *See Venezuela US SRL*, 789 F. Supp. 3d at 6; *Técnicas Reunidas de Talara S.A.C. v. SSK Ingeniería y Construcción S.A.C.*, 40 F.4th 1339, 1346 (11th Cir. 2022) (distinguishing *Enron Nigeria* and recognizing that "a party can waive a public-policy defense by failing to raise its objection in a timely manner"). Concerns said to be "repugnant to fundamental notions of what is decent and just" would ordinarily be expected to inspire prompt objection from the allegedly injured party itself. *Enron Nigeria*, 844 F.3d at 289 (cleaned up). Yet the supposedly aggrieved sovereign here has never regarded the dissent's "considerations" as worthy of assertion, and its counsel expressly disavowed theories the dissent now advances. *See* Oral Arg. Tr. 16-17. The record suggests these "considerations" offend the dissent far more than they offend any notion of fairness or justice to Venezuela. *See Venezuela US SRL*, 789 F. Supp. 3d at 10 ("Venezuela does not even attempt to justify its position under

that governing 'basic notions of morality and justice' standard.'").

2. The dissent repeatedly imports concepts applicable to litigation in federal court and attempts to transpose them onto international arbitration in a foreign country. That is a mistake. International arbitration is not the equivalent of federal-court litigation; if anything, it is more aptly compared to domestic arbitration. *See Mitsubishi Motors Corp.*, 473 U.S. at 631. The litigation procedures and attendant formalities emphasized by the dissent are therefore inapposite here, just as they would be in the context of domestic arbitral proceedings. *See Republic of Argentina v. AWG Grp. LTD.*, 894 F.3d 327, 332 (D.C. Cir. 2018) ("Congress requires enforcement even when arbitration proceedings do not provide the full process protections that courts provide because the 'primary purpose' of the [FAA] is not to turn arbitration panels into private federal courts but to 'ensure that private agreements to arbitrate are enforced according to their terms.'" (quoting *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 682 (2010))).

3. The New York Convention does afford certain protections relating to three of the considerations the dissent identifies—"the right to be heard," "the right to adequate representation," and "the right to counsel." *See* Dissenting Op. at 9, 11, 14. But those protections arise under Article V(1)(b), not the public policy exception of Article V(2)(b) that defines this dispute and anchors the dissent. *See* New York Convention art. V(1)(b) (providing a defense where a party "was not given proper notice of the appointment of the arbitrator or of the arbitration proceedings or was otherwise

unable to present his case").[5] Venezuela itself recognized that distinction. At oral argument, its counsel expressly disclaimed any reliance on inadequate representation, acknowledging that such a claim would arise under a different Convention exception and that Venezuela was proceeding solely under the public policy exception concerning the President's recognition authority. *See* Oral Arg. Tr. 16-17.

4. The dissent's two remaining considerations are "respect for foreign sovereignty" and "the separation of powers." Dissenting Op. at 16, 19. The dissent, however, fails to show that confirmation of the damages award against Venezuela violates any "basic notions of morality and justice" embedded in these structural concerns. *TermoRio*, 487 F.3d at 938

---

[5] To the extent the protections afforded by the New York Convention mirror our domestic due process rights, "like all other due process rights, [these Convention rights] may be waived." *Emps. Ins. of Wausau v. Banco De Seguros Del Estado*, 199 F.3d 937, 942 (7th Cir. 1999) (citing *D.H. Overmyer Co. v. Frick Co.*, 405 U.S. 174, 185 (1972)). The dissent fixates on public policy considerations it claims compel judgment for one party—notwithstanding that those considerations are inapposite here—while disregarding the countervailing public policy that "[o]ur adversary system is designed around the premise that the parties know what is best for them." *Sec'y of Lab., Mine Safety & Health Admin. v. Westfall Aggregate & Materials, Inc.*, 69 F.4th 902, 911 (D.C. Cir. 2023) (alteration in original) (quoting *Greenlaw v. United States*, 554 U.S. 237, 244 (2008)); *see also Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983) (Scalia, J.) ("The premise of our adversarial system is that appellate courts do not sit as self-directed boards of legal inquiry and research, but essentially as arbiters of legal questions presented and argued by the parties before them."). It would be remarkable if due process rights may be waived in a purely domestic suit but not in an action to enforce an international arbitration award against a foreign nation.

(cleaned up). Indeed, this court has previously rejected a similar attempt to leverage these same principles as grounds for a New York Convention public policy defense for this very reason. *BCB Holdings*, 650 F. App'x at 19 ("Belize also argues that the District Court should have refused to enforce the arbitral award based on two other public policies: the separation of powers and international comity. But enforcement in this case would not violate any 'basic notion of morality and justice' rooted in either of those two doctrines."); *see also* RESTATEMENT (THIRD) U.S. LAW OF INT'L COMM. ARB. § 4.16 reporters' note b (2019) ("To read the public policy defense as a parochial device protective of national political interests would seriously undermine the Convention's utility. This provision was not meant to enshrine the vagaries of international politics under the rubric of public policy." (cleaned up)).

5. Recognizing that no individual consideration satisfies the public policy exception, the dissent constructs its public policy argument by stitching together five disparate considerations. *See* Dissenting Op. at 9 n.32. A Second Circuit decision is offered in support of this kitchen-sink approach, *see Corporación Mexicana de Mantenimiento Integral, S de RL de CV v. Pemex-Exploración y Producción*, 832 F.3d 92, 107 (2d Cir. 2016), but that authority cannot be squared with the Supreme Court's requirement "that any such public policy must be explicit, well defined, and dominant," *E. Associated Coal Corp. v. United Mine Workers of Am., Dist. 17*, 531 U.S. 57, 62 (2000) (cleaned up).

6. The dissent devotes considerable attention to disputing the proposition that Venezuela forfeited its public-policy arguments by failing to present them in arbitration. *See* Dissenting Op. at 24-27. That excursion, however, sidesteps

the premise on which our reasoning actually rests: not that Venezuela failed to raise any of the dissent's so-called "rights" before the tribunal, but that it never asserted them at any point in the enforcement proceedings in the district court and in this court on appeal.[6]

*Affirmed*.

---

[6] For centuries this move has commonly been called setting up a "straw man," defined as "an imaginary adversary, or an invented adverse argument, adduced in order to be triumphantly confuted." 10 *Oxford English Dictionary* 1090 (1st ed. 1933). It is sometimes difficult to distinguish a "straw man" from a "slippery slope" or a "red herring" or "tilting at windmills." The label does not matter.

Walker, *Circuit Judge*, dissenting:

On the western side of Munich sits Schloss Nymphenberg, a palace wider than Versailles. Built in 1675, it served for centuries as the summer home for the House of Wittelsbach, rulers of Bavaria until the end of the first World War. Now, for ten euros, you can take a tour.

Franz Bonaventura Adalbert Maria Herzog von Bayern lives in a side wing of the palace. He is the ninety-two-year-old great-grandson of the last king of Bavaria, Ludwig III. A former prisoner of the Nazis, today von Bayern is renowned as a collector and connoisseur of modern art.

Von Bayern is also, in what he calls a "charming historical curiosity," heir to the throne of England and Scotland.[1] Or at least he would be, if William and Mary had not deposed James II in the "Glorious Revolution" of 1688, and if the Act of Settlement had not deposed James's Catholic heirs in 1701.

Imagine — far-fetched though it may be this side of Culloden — that von Bayern were to enter an appearance as the sovereign representative of the United Kingdom in a $100-million international arbitration. And imagine he were then to replace the U.K.'s lawyer with one of his choosing before losing the suit.

In that arbitration, was the U.K. heard in a meaningful sense? Was von Bayern a proper representative of the U.K.? Did the U.K. enjoy the right to counsel of its choosing? Would a U.S. court's recognition of the award evince respect for the sovereignty of the United Kingdom? Would it respect the President's authority to recognize (as he of course does) that

---

[1] Dominik Baur, *"Ich bin nicht traurig, dass ich kein König bin,"* Taz (July 23, 2016), https://perma.cc/4NQP-APDN (translation from German original).

the House of Windsor is the U.K.'s sovereign government, not the House of Wittelsbach? If the answer is "no, no, a thousand times no," would recognition and enforcement of the arbitral award accord with our nation's basic notions of justice?[2]

Swap Venezuela for the United Kingdom, the National Assembly for the House of Windsor, and Nicolás Maduro for Franz von Bayern, and you get something pretty close to the international arbitration at issue today. Venezuela was represented in that arbitration by a man, Nicolás Maduro, whom the United States did not recognize as the president of Venezuela when the arbitral tribunal ordered Venezuela to pay an opposing party $100 million. And then the district court for the District of Columbia recognized that award under the New York Convention.

That was error. Under the New York Convention, and in accordance with hundreds of years of international judgment-recognition practice, U.S. courts need not recognize and enforce a foreign arbitral award when doing so would offend our nation's "public policy."[3]

---

[2] *Learning Resources, Inc. v. Trump*, 146 S. Ct. 628, 646 n.6 (2026); *see also* William Baude & Dan Epps, *Betty Boop or Shakespeare*, Divided Argument 34:25–38:57 (Feb. 21, 2026) (delving into the origins of this phrase); William Baude & Dan Epps, *A Subversive Mission*, Divided Argument 4:56–8:19 (Mar. 11, 2026) (same).

[3] United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards art. V(2)(b), June 10, 1958, 21 U.S.T. 2517; *see also Fauntleroy v. Lum*, 210 U.S. 230, 240–42 (1908) (White, J., dissenting) (explaining that the rule that domestic courts need not recognize and enforce judgments contrary to their public policy has been recognized since at least "the time of the adoption of the Constitution").

To be clear, in this context, "public policy" is not grounded in "general considerations of supposed public interests."[4]  It is grounded in our "laws and legal precedents."[5]  As courts have explained, the public-policy exception applies when "enforcement would violate the forum state's most basic notions of morality and justice,"[6] or when "an arbitration award tends clearly to undermine the public interest, the public confidence in the administration of the law, or security for individual rights of personal liberty or of private property."[7]

In my view, public policy as understood in this context requires respect for the right to be heard, the right to adequate representation, and the right to choose one's counsel.  It also requires respect for the sovereignty of foreign nations and for our system of separated powers, in which the responsibility for foreign affairs lies most of all with the President and least of all with the judiciary.

Recognition of this case's arbitral award respects none of those principles.  It therefore fails to accord with U.S. public policy.  Because the district court held otherwise, I would reverse.

---

[4] *W.R. Grace & Co. v. Local Union 759, International Union of United Rubber, Cork, Linoleum and Plastic Workers of America*, 461 U.S. 757, 766 (1983) (quoting *Muschany v. United States*, 324 U.S. 49, 66 (1945)).

[5] *Id.*

[6] *TermoRio SA ESP v. Electranta SP*, 487 F.3d 928, 938 (D.C. Cir. 2007).

[7] *Enron Nigeria Power Holding, Ltd. v. Federal Republic of Nigeria*, 844 F.3d 281, 289 (D.C. Cir. 2016) (quotation omitted).

**I**

I begin with a brief discussion of the President's recognition power followed by a summary of the proceedings in this case.

**A**

As a matter of international law, the fundamental sovereign entity is the state. The state is a territorial body with "a permanent population" that "has the capacity to engage in[ ] formal relations with other such entities."[8] Or as Emer de Vattel put it around the time of the Founding, focusing more on the people than the land, the state is a "societ[y] of men united together" that "becom[es] a moral person . . . susceptible of obligations and rights."[9]

But states, as abstract entities, cannot act in the material world. Instead, they must act through their representatives.[10] And the sovereign representative of a "sovereign state" is its government.[11]

As a matter of United States constitutional law, the President gets to say which entities qualify as states and who serves as those states' representatives.[12] So, for example, as a matter of United States law, Palestine is not a state because the

---

[8] *Restatement (Third) of Foreign Relations Law* § 201 (A.L.I. 1987).

[9] Emer de Vattel, *The Law of Nations* Prelim. §§ 1–2 (1765) (trans. 1797).

[10] *See Holmes v. Jennison*, 39 U.S. (14 Pet.) 540, 573 (1840) (opinion of Taney, C.J., joined by three Justices).

[11] *Guaranty Trust Co. of New York v. United States*, 304 U.S. 126, 137 (1938); *see also The Sapphire*, 78 U.S. 164, 168 (1871).

[12] *Zivotofsky ex rel. Zivotofsky v. Kerry*, 576 U.S. 1, 11, 17 (2015).

President says so.[13] That is "conclusive on all domestic courts," even if other nations recognize a Palestinian state.[14] And "when President Washington recognized the French Revolutionary Government by receiving its ambassador," domestic courts could no longer consider King Louis XVI the sovereign representative of France, even if the Habsburgs thought otherwise.[15]

Recognition is not a mere formality, either. "Legal consequences follow formal recognition."[16] Those "legal consequences" are left to the courts to figure out.[17] Thus, courts hold that a recognized government may not be questioned in United States courts for any "of the actions of that government within its own territory."[18] Courts also confer sovereign immunity upon recognized sovereigns.[19] And they

---

[13] *See* The White House, *At UN, President Trump Champions Sovereignty, Rejects Globalism* (Sept. 23, 2025), https://perma.cc/NY54-TUUG (noting that President Trump had castigated certain members of the UN for "seeking to unilaterally recognize a Palestinian state").

[14] *Guaranty Trust*, 304 U.S. at 138; *see also Zivotofsky*, 576 U.S. at 17.

[15] *Zivotofsky*, 576 U.S. at 12.

[16] *Id.* at 11.

[17] *Guaranty Trust*, 304 U.S. at 138.

[18] Robert J. Reinstein, *Recognition: A Case Study on the Original Understanding of Executive Power*, 45 U. Rich. L. Rev. 801, 803 (2011); *Banco Nacional de Cuba v. Sabbatino*, 376 U.S. 398, 417 (1964).

[19] *Zivotofsky*, 576 U.S. at 11.

permit only a recognized government to sue on behalf of the sovereign state in United States courts.[20]

Recognition does not bring about only legal consequences, though. On the contrary, "the recognition power has been most significant as an important weapon in the Executive's foreign policy arsenal."[21] For example, Theodore Roosevelt used the recognition power to create the new state of Panama "from within the boundaries of" Colombia.[22] He then negotiated with the newly recognized Panamanian Government — which he had shepherded into power[23] — "[t]o obtain the lease for the Panama Canal."[24]

Other examples abound. President Taft, one of this country's greatest expositors of executive power,[25] used the recognition power "repeatedly . . . to coerce commercial and economic concessions from, and to justify military interventions in, Latin American countries."[26] Similarly, President Wilson refused "to recognize the Huerta regime in Mexico . . . , which contributed to" Huerta's "overthrow the following year."[27] And in 1948, "President Truman recognized

---

[20] *Guaranty Trust*, 304 U.S. at 137; *Zivotofsky*, 576 U.S. at 11. That is why for many years "the Soviet Government could not maintain a suit in" United States "courts." *Guaranty Trust*, 304 U.S. at 137.

[21] Reinstein, *supra*, at 803.

[22] *Id.*; *see also* Taylor Cole, *The Recognition Policy of the United States Since 1901*, at 39–41 (1928).

[23] Cole, *supra*, at 39–41 (noting that Panama could not sustain itself and that "[t]he United States in reality committed an act of intervention," including the use of military forces, "primarily for the furtherance of its own interests").

[24] Reinstein, *supra*, at 803.

[25] *See, e.g.*, *Myers v. United States*, 272 U.S. 52 (1926).

[26] Reinstein, *supra*, at 803.

[27] *Id.* at 804 n.13.

the State of Israel eleven minutes after its declaration of independence, even though Israel was under a military assault from Arab states."[28]

## B

This case turns on the legal consequences of President Trump's decision in 2019 to derecognize the Maduro regime as the sovereign government of Venezuela.

The case began in 2013, when Venezuela US SRL ("VUS") — a company that ironically hales from Barbados — commenced arbitral proceedings against Venezuela. Because of a treaty between Barbados and Venezuela, the arbitration proceeded before the Permanent Court of Arbitration in The Hague. At the time the suit commenced, Nicolás Maduro headed the then-recognized Venezuelan government. The law firm of Curtis, Mallet-Prevost, Colt & Mosle LLP served as Venezuela's counsel. By sometime around November 2017, the parties had completed briefing on both the tribunal's jurisdiction and the merits of VUS's claim.

As the tribunal deliberated, turmoil ensued in Caracas. In May 2018, Maduro claimed victory in a fraudulent election. In January 2019, the Venezuelan National Assembly responded by declaring Juan Guaidó the Interim President of Venezuela. That same day, President Trump derecognized Maduro's regime, recognizing the National Assembly and President Guaidó instead. In addition, President Trump took steps to safeguard Venezuelan assets in the United States for the sake of Guaidó and the National Assembly.[29]

---

[28] *Id.* at 804.

[29] *See* U.S. Embassy & Consulates in Mexico, *President Donald J. Trump Supports the Venezuelan People's Efforts to Restore*

But the tribunal's band played on, unaffected by the cataclysmic world events transpiring across the Atlantic. Eventually, more than two years later, in February 2021, the tribunal issued its decision on jurisdiction and the merits. It found Venezuela liable for failing to pay VUS certain dividends. And lo and behold, in issuing that decision, the tribunal revealed that the derecognized, illegitimate Maduro regime had purported to replace Venezuela's counsel as of June 30, 2020. Yet "[n]either the U.S.-recognized government nor Curtis received notice of this purported replacement."[30]

After that, the arbitration proceeded to the final phase: damages. The tribunal conducted a new round of briefing and held a hearing. VUS participated, along with its counsel. So did the Maduro regime, along with its counsel, the Guglielmino & Associados SA law firm of Argentina. Venezuela, the National Assembly, and their counsel did not. Still, on November 4, 2022, the tribunal issued an award of more than $100 million against Venezuela.

VUS took that $100-million award to the United States District Court for the District of Columbia, requesting recognition under the New York Convention. The district court obliged, holding that recognition and enforcement of the award would not violate U.S. public policy.

## II

That was wrong. As courts have explained, the New York Convention's public-policy exception applies when "enforcement would violate the forum state's most basic

---

*Democracy* (Jan. 30, 2019), https://mx.usembassy.gov/president-donald-j-trump-supports-the-venezuelan-peoples-efforts-to-restore-democracy/.

[30] Appellant Br. 14.

notions of morality and justice."[31]  The "high hurdle" of that "exception is surmounted here by [five] powerful considerations."[32]  All five flow from appreciation of the President's exclusive recognition power.

## A

*First*, the right to be heard.  One of the foundational principles in Anglo-American jurisprudence — if not all jurisprudence — is *audi alteram partem*, or "hear the other side."  As Justice Field explained in *Windsor v. McVeigh*, the *audi alteram partem* principle "lies at the foundation of all well-ordered systems of jurisprudence."[33]  Lord Fortescue traced the *audi alteram partem* principle back to what some consider the very beginning: "[E]ven God himself," Fortescue observed, "did not pass sentence upon Adam, before he was called upon to make his defence. . . .  And the same" right "was" given "to Eve also."[34]

As should be unsurprising when it comes to such a hoary principle, the *audi alteram partem* principle has long been considered fundamental.  Indeed, the Supreme Court has called it "[t]he fundamental requisite of due process of law."[35]  That

---

[31] *TermoRio*, 487 F.3d at 938.

[32] *Corporación Mexicana de Mantenimiento Integral, S de RL de CV v. Pemex-Exploración y Producción*, 832 F.3d 92, 107 (2d Cir. 2016) (holding the public-policy exception satisfied on the basis of only "four powerful considerations").

  In today's case, the public-policy exception is satisfied by the five considerations in conjunction, not necessarily any one in isolation.

[33] 93 U.S. 274, 277 (1876).

[34] *Dr. Bentley's Case*, 93 Eng. Rep. 698, 704 (K.B. 1723); *see also Genesis* 3:9–13.

[35] *Mullane v. Central Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950) (quoting *Grannis v. Ordean*, 234 U.S. 385, 394 (1914)); *see also Richards v. Jefferson County, Alabama*, 517 U.S. 793, 797 n.4

accords with pre-Founding English understandings, where the principle was considered one of two basic principles of natural justice.[36]  The principle shows up in criminal suits as the right not to be tried in absentia, and in civil suits, as the right to a hearing.

Recognizing this award fails to respect this venerable principle.  At the damages phase of the arbitration — where attorneys for the *former* president of Venezuela filed briefs and made arguments after ousting attorneys for the *actual* president

---

(1996) ("The opportunity to be heard is an essential requisite of due process of law in judicial proceedings."); *in re Oliver*, 333 U.S. 257, 273 (1948) ("A person's right to . . . an opportunity to be heard in his defense" is "basic in our system of jurisprudence . . . ."); *Caritativo v. California*, 357 U.S. 549, 558 (1958) (Frankfurter, J., dissenting) ("Audi alteram partem — hear the other side! — a demand made insistently through the centuries, is now a command, spoken with the voice of the Due Process Clause . . . ."); *American Security Council Education Foundation v. FCC*, 607 F.2d 438, 474 (D.C. Cir. 1979) (en banc) (Wilkey, J., dissenting) ("The most essential part of due process for centuries has been recognized by Anglo-American jurists to be *audi alteram partem* — 'hear the other side.'").

[36] *See* Frederick F. Schauer, *English Natural Justice and American Due Process: An Analytical Comparison*, 18 Wm. & Mary L. Rev. 47, 48 (1976) (calling the *audi alteram partem* principle one of "two fundamental principles" of natural justice in English jurisprudence alongside the *nemo judex* principle); *see also id.* at 48 & n.10 (the *nemo judex* principle derives from the Latin maxim "*nemo debet esse judex in propria sua causa*," which means no one should be judge in his own cause); John M. Kelly, Note, *Audi Alteram Partem*, Nat. L. F. 103, 103 (1964) ("It is a firmly established rule of common law that a judge or anyone exercising a judicial function must hear both sides of every case . . . .  This rule is recognized in England as one of fundamental justice, and a failure to observe it makes the whole proceeding defective and voidable; in the United States of America the principle is part of the notion of 'due process' and is equally well protected." (footnote omitted)).

of Venezuela — the sovereign state of Venezuela was not heard, because the voice that spoke was not its own.[37]

To be sure, Venezuela did get *some* form of hearing at *some* stage of the proceeding. Sometimes that may be enough. But here, it is not. The arbitral proceeding was conducted in separate phases. And during the critical damages phase, only VUS was allowed to submit briefing and attend the hearing. The *audi alteram partem* principle, though, is not satisfied when only one side is heard — especially not when millions upon millions of dollars hang in the balance.

## B

*Second*, the right to adequate representation.[38] Our law recognizes that when the real party in interest is represented by

---

[37] *Sabbatino*, 376 U.S. at 410 ("the refusal to recognize" a regime "signifies this country's unwillingness to acknowledge that the" regime "in question speaks as the sovereign authority for the territory it purports to control").

[38] This right is intertwined with the *audi alteram partem* principle. Yet it is distinct at least in this case. Here, the *audi alteram partem* principle focuses more on the *exclusion* of the defendant; the right to adequate representation focuses on the *inclusion* of a "stranger" or other inadequate representative. *Rosenberg v. United States*, 346 U.S. 273, 291 (1953) (opinion of Jackson, J., joined by five other Justices) (discussing the impropriety of a "stranger" intervening to represent the defendants even though "[h]is intervention was unauthorized by them"); *see also Whitmore v. Arkansas*, 495 U.S. 149, 164 (1990) (courts should not recognize representative suits "by intruders or uninvited meddlers"). So the problem for the *audi alteram partem* principle is that Venezuela was excluded; the problem for the adequate representation right is that the Maduro regime was included.

another individual — as states are in some sense represented by their governments[39] — representation must be adequate.

Courts have recognized this right in a variety of contexts. As the Supreme Court has put it in the context of suits by "next friends," the representative "must be truly dedicated to the best interests of the person on whose behalf he seeks to litigate."[40] Parental suits on behalf of children provide another example of this principle in action, since such suits rest on the law's "historic[]" recognition "that natural bonds of affection lead parents to act in the best interests of their children."[41] So too with class actions. The requirement that class representatives "in fact adequately represent[]" the interests of the class members derives from the Due Process Clause[42] and is reflected in the Federal Rules.[43]

Allowing recognition and enforcement of this arbitral award contravenes that principle of justice deeply rooted in United States law. As the Supreme Court has explained, "the refusal to recognize" a regime "signifies this country's unwillingness to acknowledge that the" regime "in question speaks as the sovereign authority for the territory it purports to

---

[39] *The Sapphire*, 78 U.S. at 168; *cf. Al-Aulaqi v. Obama*, 727 F.Supp.2d 1, 16 (D.C. Cir. 2010) (noting that another type of representative suit, a suit by a next friend, does not involve the representative "himself becom[ing] a party to the . . . action in which he participates," but rather the representative "simply pursues the cause on behalf of the . . . real party in interest" (quoting *Whitmore*, 495 U.S. at 163).

[40] *Whitmore*, 495 U.S. at 163.

[41] *Parham v. JR*, 442 U.S. 584, 602 (1979); *see also Mirabelli v. Bonta*, 146 S. Ct. 797, 802 (2026) (per curiam) ("the primary protectors of children's best interests" are "their parents").

[42] *Hansberry v. Lee*, 311 U.S. 32, 42–43 (1940).

[43] *See* Fed. R. Civ. P. 23(a)(4).

control."[44] That means that our own country refuses to acknowledge that the Maduro regime "speaks as the sovereign authority for" Venezuela. That, in turn, means that in the arbitral proceeding, an utter "stranger" assumed authority to speak for Venezuela.[45] That contravenes the bedrock principle of adequate representation.

That's not the half of it, either. The Maduro regime was worse than a stranger; it was an enemy. To quote President Trump, the Maduro regime has "rob[bed] the Venezuelan people of their resources" and engaged in "ongoing human rights abuses."[46] The regime's "military and intelligence sector . . . has committed horrible abuses against the Venezuelan people."[47] To sum up (again quoting the President), "[t]he Maduro regime does not care about the welfare of [its] own people."[48] These determinations by the Chief Executive demand deference.[49] And they reinforce the

---

[44] *Sabbatino*, 376 U.S. at 410.

[45] *Rosenberg*, 346 U.S. at 291.

[46] Trump White House Archives, *President Donald J. Trump is Cutting Off the Financial Resources of Maduro and His Cronies*, (Aug. 6, 2019), https://perma.cc/RNY8-A5NG.

[47] *Cutting Off Financial Resources*, *supra*; *see also* Trump White House Archives, *Remarks by President Trump in a Multilateral Meeting on the Bolivarian Republic of Venezuela* (Sept. 25, 2019), https://perma.cc/H932-7XWU ("Maduro has sold out his nation"); Proclamation No. 10903, *Invocation of the Alien Enemies Act Regarding the Invasion of the United States by Tren De Aragua*, 90 Fed. Reg. 13033, 13033 (Mar. 14, 2025) (noting the Maduro regime controls military forces).

[48] *Multilateral Meeting*, *supra*.

[49] *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) (explaining that deference is owed to the Executive regarding "the conditions which prevail in foreign countries").

conclusion that the Maduro regime could not possibly have had the "best interests of" Venezuela at heart.[50]

## C

*Third*, the right to counsel.[51] Not only has this principle of public policy been recognized in numerous precedents; it is

---

[50] *Whitmore*, 495 U.S. at 163.

To be clear, for at least two reasons, my analysis does not suggest that any federal court could hold that a recognized government infringes this principle. First, no federal judge may "set himself up for a judge of [the] conduct" of a foreign sovereign. *Franchise Tax Board of California v. Hyatt*, 587 U.S. 230, 239 (2019); *see also Sabbatino*, 376 U.S. at 423, 425 (explaining that "the Judicial Branch" should not "pass[ ] on the validity of foreign acts of state" and that that rule is grounded in "the competence and function of the Judiciary and the National Executive in ordering our relationships with other members of the international community"). Second, courts must avoid as much as possible "judicial criticism of nations," even those "established on a more authoritarian basis than our own." *Zschernig v. Miller*, 389 U.S. 429, 440 (1968); *cf. Oetjen v. Central Leather Co.*, 246 U.S. 297, 304 (1918) ("To permit the validity of the acts of one sovereign state to be reexamined and perhaps condemned by the courts of another would very certainly imperil the amicable relations between governments and vex the peace of nations." (quotation omitted)).

[51] As were the first consideration (the right to be heard) and the second consideration (the right to adequate representation), the second and third (the right to choose counsel) are somewhat intertwined in this case. But they are not one and the same. If the National Assembly had served as Venezuela's representative, but the arbitral tribunal had forced Venezuela, unlike VUS, to proceed *pro se* or had assigned Venezuela counsel of the tribunal's own choosing, Venezuela would not have enjoyed the right to counsel, even though it would have had its proper representative appearing on its behalf. So here the second consideration is that the Maduro regime improperly represented Venezuela, and the third consideration is that

also reflected in various constitutional provisions, as well as in "numerous federal statutes."[52]  Here is a sampling:

- U.S. Const. amend. VI: "In all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defence."

- *Powell v. Alabama*: "It is hardly necessary to say that the right to counsel being conceded, a defendant should be afforded a fair opportunity to secure counsel of his own choice."[53]

- *Gideon v. Wainwright*: The right to counsel in criminal proceedings is a "fundamental safeguard[] of liberty immune from federal abridgment . . . by the Due Process Clause of the Fourteenth Amendment."[54]

- *Goldberg v. Kelly*: "The right to be heard" implicit in the Due Process Clause "would be, in many cases, of little avail if it did not comprehend the right to be heard by counsel."[55]

- 28 U.S.C. § 1654: "In all courts of the United States the parties may plead and conduct their own cases personally or by counsel . . . ."

- 5 U.S.C. § 555(b): "A person compelled to appear in person before an agency . . . is entitled to be

---

the Maduro regime foisted its own counsel upon the nation of Venezuela.

[52] *Enron Nigeria*, 844 F.3d at 287 (recognizing a "well-defined public policy" on a similar basis).

[53] 287 U.S. 45, 53 (1932).

[54] 372 U.S. 335, 341 (1963).

[55] 397 U.S. 254, 270 (1970).

accompanied, represented, and advised by counsel . . . ."

- 8 U.S.C. § 1362: "Right to counsel — In any removal proceedings before an immigration judge . . . , the person concerned shall have the privilege of being represented . . . by such counsel . . . as he shall choose."

Here Venezuela was not only denied the right to counsel of its choosing; it had counsel forced upon it. Because the Maduro regime had no claim to represent Venezuela, it forced counsel upon Venezuela when it replaced Venezuela's lawyers in the proceeding. That is inconsistent with long-standing public policy recognizing that a litigant should be able to choose his counsel.

**D**

*Fourth*, respect for foreign sovereignty. The district court itself suggested that "respecting the sovereignty . . . of foreign states" is a compelling public policy.[56] But it failed to see how it would disrespect the sovereignty of both Venezuela and the National Assembly to recognize and enforce this award.

**1**

The dignity of the sovereign requires granting him the privilege of representation by his true representative, rather than some imposter. I take that to be intuitive. Who would argue that it would have evinced respect for the sovereignty of the United States if some tribunal in 1795 had dragged our sovereign nation before it and forced our people to be represented by King George III?

---

[56] *Venezuela US SRL v. Bolivarian Republic of Venezuela*, 789 F.Supp.3d 1, 11 (D.D.C. 2025).

To put doctrinal flesh on those intuitive bones, consider Chief Justice Marshall's logic 200 years ago in *The Schooner Exchange v. M'Faddon*.[57]   As Chief Justice Marshall explained, "[o]ne sovereign" is "in no respect amenable to another," and he "can be supposed" to submit himself to foreign jurisdiction only "in the confidence that the immunities belonging to his independent sovereign station, though not expressly stipulated, are reserved by implication, and will be extended to him."[58]

So even if the state of Venezuela agreed to submit itself to arbitration, one cannot think Venezuela "intend[ed] to subject [it]self to a jurisdiction incompatible with [its] dignity."[59]  And it would seem incompatible with that dignity to have an illegitimate regime, rather than its rightful government, represent it before a foreign tribunal.

**2**

Recognizing and enforcing the award would also fail to respect the sovereign representative of Venezuela, the National Assembly.

According respect to the representatives of a sovereign nation is one of our most time-honored legal traditions.  After all, it was not for nothing that the Founders decided to confer original jurisdiction upon the Supreme Court over "all Cases affecting Ambassadors" and "other public Ministers and Consuls."[60]  It was because, as Hamilton explained, public ministers were "the immediate representatives of their sovereigns," so "out of respect to the sovereignties they

---

[57] 11 U.S. (7 Cranch) 116 (1812).

[58] *Id.* at 137.

[59] *Id.*

[60] U.S. Const. art. III, § 2, cl. 2.

represent," it was "both expedient and proper" that their cases "should be submitted in the first instance to the highest judicatory of the nation."[61]

The First Judiciary Act followed suit in recognizing the dignity of the representatives of foreign sovereigns. Section 13 of that act conferred upon the Supreme Court "original, but not exclusive[,] jurisdiction of all suits brought by ambassadors, or other public ministers, or in which a consul, or vice consul," should "be a party."[62] That not only gave foreign ministers the right to go straight to the Supreme Court, but also the privilege to choose another court should they prefer. And that same section provided the Supreme Court "exclusive[] . . . jurisdiction of suits or proceedings against ambassadors, or other public ministers," or even "their domestics, or domestic servants."[63]

---

[61] *The Federalist* No. 81, at 487 (Clinton Rossiter ed., 1961).

[62] Judiciary Act of 1789, § 13, 1 Stat. 73, 80–81.

[63] *Id.* § 13, 1 Stat. 80.

That latter part responded to the Van Berckel controversy, which arose after a New York constable entered the home of Pieter Johan van Berckel, the Dutch Minister Plenipotentiary to the United States, "to arrest a member of his household." Anthony J. Bellia & Bradford R. Clark, *Two Myths About the Alien Tort Statute*, 89 Notre Dame L. Rev. 1609, 1616 (2014).

Moreover, the United States's "first armed conflict" was provoked when France "treat[ed]" the representatives from the new American Government as a bunch of nobodies, thereby "abus[ing] and insult[ing] their government." Stanley Elkins & Eric McKitrick, *The Age of Federalism: The Early American Republic, 1788–1800*, at 574 (1993); Alexander DeConde, *The Quasi-War: The Politics and Diplomacy of the Undeclared War with France 1797–1801*, at vii (1966) (calling the Quasi-War our nation's "first armed conflict"). *see also WMM v. Trump*, 154 F.4th 207, 242–43 (5th Cir. 2025) (Oldham, J., dissenting) (providing an "abbreviated account of the XYZ Affair"); *see also id.* at 244 ("The news of the mistreatment of

The disfavored treatment the arbitral body accorded the National Assembly flouts this long-standing U.S. public policy of according respect to the representatives of foreign sovereigns. In the proceeding, the Maduro regime, not the National Assembly, was accorded the honor of representing the sovereign state of Venezuela. So the rightful representative was treated as an imposter, while an imposter was treated as the rightful representative. Thus, recognizing this award would contravene the U.S. public policy of respecting the representatives of foreign nations.

## E

*Fifth*, the separation of powers. When it comes to foreign affairs and national security, "judicial intervention" is often "itself . . . a serious violation of separation of powers."[64] That is because foreign affairs and national security implicate a host of issues "for which the Judiciary has neither aptitude, facilities nor responsibility."[65]

So it is here. "[T]he Judiciary has neither aptitude, facilities nor responsibility" for deciding which government truly speaks for the people of Venezuela.[66] The question is "delicate, complex, and involve[s] large elements of prophecy."[67]

---

the American envoys lit the country on fire. . . . As the American people raged, the Nation prepared for war.").

[64] H. Jefferson Powell, *The President's Authority over Foreign Affairs: An Executive Branch Perspective*, 67 Geo. Wash. L. Rev. 527, 537 (1999).

[65] *Chicago & Southern Air Lines, Inc. v. Waterman SS Corp.*, 333 U.S. 103, 111 (1948).

[66] *Id.*

[67] *Id.*

Across three presidencies, the Executive Branch has exercised its exclusive recognition power to answer that question like this: The Maduro regime is illegitimate. And the President has not stopped there. He has used his recognition determination as a tool for regime change.

Current events prove as much. No longer is Nicolás Maduro a run-of-the-mill illegitimate leader purporting to exercise authority on behalf of a sovereign state — although he was at least that during a substantial portion of the arbitral proceeding. He is now a federal detainee after a complex operation involving both law enforcement and military forces in Venezuelan territory.[68]

Maduro's arrest reinforces this issue's sensitivity. Of course, what precisely the Executive Branch is intending to do in Venezuela, and the consequences of our recognizing a nine-figure award against the sovereign nation of Venezuela at this time, may not be perfectly clear to the judicial eye. But that is the point: Running into such an uncertain and sensitive area of foreign affairs and national security raises weighty separation-of-powers concerns. That provides one more reason why recognizing this award contravenes U.S. public policy.

---

[68] For an analysis of the legal issues involved, see Office of Legal Counsel, *Proposed War Department Operation to Support Law Enforcement Efforts in Venezuela* (Dec. 23, 2025).

## III

## A

## 1

VUS argues that *Valores Mundiales, SL v. Bolivarian Republic of Venezuela, Ministerio del Poder Popular para Relaciones Exteriores* controls this case.[69]  It does not.

In *Valores Mundiales*, two Spanish companies commenced a proceeding against Venezuela before an arbitral tribunal convened under the International Centre for Settlement of Investment Disputes Convention.[70]  The tribunal "ruled in favor" of the companies and issued a $430-million award.[71]  "Venezuela then sought to annul the . . . award" before an annulment committee.[72]  After the parties submitted briefs in the annulment proceeding, President Trump derecognized the Maduro regime, recognizing the National Assembly and Guaidó in its stead.[73]  The National Assembly then "requested . . . to replace the lawyers" for the Maduro regime.[74]  The annulment committee denied the request.[75]  It then also denied "Venezuela's request to annul the" $430-million "award," instead granting an award of attorneys' fees for the costs incurred during the annulment proceeding.[76]  Our court held both awards enforceable.

---

[69] 87 F.4th 510 (D.C. Cir. 2023).

[70] *Id.* at 513.

[71] *Id.*

[72] *Id.*

[73] *See id.*

[74] *Id.*

[75] *See id.*

[76] *Id.* at 513–14.

That has no bearing here. In *Valores Mundiales*, as noted, the awards were rendered under the International Centre for Settlement of Investment Disputes Convention, not the New York Convention. That matters. Congress granted any award rendered under the International Centre for Settlement of Investment Disputes Convention "the same full faith and credit as if the award were a final judgment" of a state court.[77] As such, no public-policy exception applied.[78] In contrast, the New York Convention applies here, and under the New York Convention, U.S. courts need not recognize a foreign arbitral award when doing so offends our nation's public policy — i.e., when "enforcement would violate [this nation's] most basic notions of morality and justice."[79]

VUS argues *Valores Mundiales* still controls because it at least made clear that our recognition of a foreign arbitral award like this one does not "contravene the President's Recognition authority under Article II of the Constitution."[80] That is wrong.

Even if, per *Valores Mundiales*, we do not usurp the President's exclusive recognition power simply by recognizing arbitral awards like this one, the President's recognition power can and must still inform the five considerations listed above.[81]

---

[77] 22 U.S.C. § 1650a(a).

[78] *See Fauntleroy*, 210 U.S. 230 (denying that states may decline recognition and enforcement of sister-state judgments on public-policy grounds); *see also Valores Mundiales*, 87 F.4th at 519 (emphasizing that the full faith and credit standard for recognition of judgments involves "no roving 'public policy exception'" (quoting *Baker v. General Motors Corp.*, 522 U.S. 222, 233 (1998)).

[79] *TermoRio*, 487 F.3d at 938.

[80] *Valores Mundiales*, 87 F.4th at 521.

[81] *See Guaranty Trust*, 304 U.S. at 138 (explaining that a recognition decision "is conclusive on all domestic courts," but courts remain "free to draw for themselves its legal consequences in litigations pending before them").

Those five together — *not* the President's recognition power in isolation — establish that recognition of this award violates U.S. public policy.  And as to those considerations, *Valores Mundiales* says nothing of import here — nary a word about our legal system's concerns with the right to be heard, or the right to adequate representation, or the right to counsel,[82] or sovereign dignity, or the separation of powers concerns that

---

[82] To be sure, in *Valores Mundiales*, Venezuela tried to challenge recognition on the basis that it was denied an opportunity to be heard during the arbitral proceedings.  The court held that under the full faith and credit standard that provided no basis for refusing to recognize the award.  *See Valores Mundiales*, 87 F.4th at 520.  Again, though, that bears no relevance here.

The fact that the full faith and credit standard applied in *Valores Mundiales* was critical on this point, too.  Under the full faith and credit standard, as the court noted, the only plausible bases for nonrecognition were a lack of jurisdiction or an inauthentic award, but neither of those issues were "up for debate."  *Id.*

That may well have been enough.  But the *Valores Mundiales* court went on.  Still, its follow-on discussion bears no relevance.  The court noted that "even as to questions of jurisdiction," the full faith and credit standard was satisfied "when the second court's inquiry discloses that those questions have been fully and fairly litigated and finally decided in the court which rendered the original judgment." *Id.* (quoting *Durfee v. Duke*, 375 U.S. 106, 111 (1963)).  That more than disposed of the challenge in *Valores Mundiales*.  The tribunal had at least considered whether the National Assembly and its lawyers should be allowed to replace the Maduro regime and its lawyers.  Thus, the *Valores Mundiales* court rejected what it saw as Venezuela's effort "to prevent enforcement by rehashing an issue that the" tribunal had "considered and resolved," because the fact that that issue was already considered during the arbitral proceedings was all that mattered for purposes of full faith and credit.  *Id.*; *see also id.* at 521.  Thus, the court did not consider, nor did it have any occasion to consider, whether Venezuela was *in fact* properly represented during those proceedings.

arise when judges meddle in matters of foreign affairs and national security.[83]

So *Valores Mundiales* does not control this case.

**2**

VUS notes that when the Curtis law firm — counsel for the legitimate Venezuelan government — learned that the arbitral tribunal had allowed the illegitimate Maduro regime to replace Curtis with new counsel chosen by the Maduro regime, "neither Curtis" nor the National Assembly "made any further attempts to participate in the arbitration."[84] But "forfeiture cannot divest the court of its duty to resolve the public policy question."[85] And to the extent VUS's point is that Venezuela's failure to raise the argument shows that recognition of the award does not implicate public policy, I disagree for three reasons.

*First*, the sovereign government of Venezuela does not need to bow as suppliant before an arbitral panel and beg to receive the dignity that is any sovereign's due — especially

---

[83] To the extent Venezuela failed to raise in its briefing these public policies — which are downstream of the recognition power in this case — it does not matter. *See Enron Nigeria*, 844 F.3d at 288 (holding that "forfeiture cannot divest the court of its duty to resolve the public policy question").

[84] Appellee Br. 11; *see also id.* at 21 n.3 ("In *Valores Mundiales*, but not here, the Interim Government attempted, unsuccessfully, to replace the Maduro Regime as the government's representative during the annulment proceedings."); *cf.* Tr. of Oral Arg. 3–4 (Judge Rao: "I mean, here Venezuela didn't make any objection before the tribunal about the question of representation."); *id.* at 5–6 (Judge Rao: "[W]hy would the arbitral tribunal feel the need to question who was representing Venezuela if Venezuela made no challenge to it[?]").

[85] *Enron Nigeria*, 844 F.3d at 288.

when that sovereign has already been kicked to the curb once.[86] Our government would — or at least should — deserve better than that.  And the sovereign government of Venezuela should not be treated differently.[87]

*Second*, it likely would have been futile for Venezuela to raise these arguments before the arbitral tribunal.[88]   Even

---

[86] Brief for Defendant-Appellant, *Valores Mundiales*, 87 F.4th 510 (No. 23-7077), 2023 WL 5276637, at *13–16 (explaining an arbitral tribunal's previous rejection of the recognized Venezuelan government's attempt to represent Venezuela in another proceeding on the grounds that Venezuela's representative had "not proven his legitimacy to represent Venezuela"); *see also Valores Mundiales, SL v. Bolivarian Republic of Venezuela*, No. 19-cv-46-FYP-RMM, 2022 WL 17370242, at *3–4 (D.D.C. Aug. 3, 2022).

[87] *See Franchise Tax*, 587 U.S. at 239 (emphasizing the "perfect equality . . . of sovereigns" (quoting *The Schooner Exchange*, 11 U.S. (7 Cranch) at 137)); Vattel, *supra*, Prelim. § 18 ("[N]ations . . . are naturally equal, and inherit from nature the same obligations and rights.  Power or weakness does not in this respect produce any difference. . . .  [A] small republic is no less a sovereign state than the most powerful kingdom.").

[88] *See supra*, note 86 (discussing a previous arbitral tribunal's rejection of the National Assembly's attempt to intervene in an ongoing proceeding); *see also* JA 92 (decision by annulment committee in *ConocoPhillips Petrozuata BV v. Bolivarian Republic of Venezuela* explaining that because the committee "is neither a political body nor the deliberative organ of an International Organization," it "cannot hear — and decide — a political question, such as the legitimate government of Venezuela").

VUS's counsel seems to recognize this.[89] So I would not give analogies to doctrines like forfeiture much weight here.[90]

*Third*, the legitimate Venezuelan government does not have unlimited resources at its disposal. So I would not demand that it continue intervening in every single arbitral proceeding worldwide — despite prospects of success that are uncertain at best — on pain that American courts will otherwise allow the Maduro regime to continue bleeding the resources of the Venezuelan people.[91]

If VUS wants to enforce its award in a place that does not share our nation's views about Venezuela, fine. It can try its

---

[89] *See* Tr. of Oral Arg. 23 (counsel for VUS) (suggesting that "under the rules of the arbitral regime, it was proper for" the Maduro Regime to represent Venezuela).

[90] *See PruneYard Shopping Center v. Robins*, 447 U.S. 74, 86 n.9 (1980) (explaining that federal claims are "adequately presented even though not raised in lower state courts" if there was no point in raising those claims in the lower courts); *Carr v. Saul*, 593 U.S. 83, 93–95, 94 n.7 (2021) (noting that there is a futility exception to issue exhaustion and that it is futile to raise an argument the tribunal cannot entertain); *see also Hettinga v. United States*, 560 F.3d 498, 503 (D.C. Cir. 2009) (non-statutory issue exhaustion not required where the agency "lacks institutional competence to resolve the particular type of issue presented, such as the constitutionality of a statute"); *cf. MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 125 (2007) (rejecting an argument that a party "fail[ed] to argue" a particular claim "below" in part because "the argument would [have] be[en] futile"); *N.S. v. Dixon*, 141 F.4th 279, 288 (D.C. Cir. 2025) (holding that a "forfeiture" for failure to raise an argument during proceedings in the district court "should be overlooked" because "[d]uring the district court proceedings" the party's argument "seemed to" have been "foreclose[d]" by circuit precedent and was only later bolstered by Supreme Court precedent).

[91] *Singleton*, 428 U.S. at 121 (noting that one reason to forgive a forfeiture is if "injustice might otherwise result").

luck in Cuba, Russia, China, Zimbabwe, or any other jurisdiction — out of the 170 or so that have acceded to the New York Convention — that never stopped recognizing the Maduro regime.  But it is not the fault of Venezuela's actual government that VUS chose to enforce its award here, in a country that appreciates that government's legitimacy — or at least purports to.

**B**

The majority argues that several of my public-policy concerns are really due-process concerns.  I am not in complete disagreement.  There is some overlap in this context between public policy and due process.  But in this particular context, that point is not dispositive.

The majority argues that the right to be heard, the right to adequate representation, and the right to counsel matter only under Article V(1)(b), which provides for non-recognition when arbitral proceedings fail to uphold "the forum state's standards of due process,"[92] and not under Article V(2)(b)'s public-policy exception.  But an expansive term like "public policy" — when glossed as turning on fundamental "notions of morality and justice"[93] — encompasses at least some fundamental procedural rights.[94]

That is especially so in cases involving foreign sovereigns.  After all, foreign sovereigns do not enjoy constitutional due

---

[92] *Iran Aircraft Industries v. Avco Corp.*, 980 F.2d 141, 145 (2d Cir. 1992).

[93] *TermoRio*, 487 F.3d at 938.

[94] *Cf.* Leonard V. Quigley, *Accession by the United States to the United Nations Convention on the Recognition and Enforcement of Foreign Arbitral Awards*, 70 Yale L.J. 1049, 1067 n.81 (1961) ("the concept of due process" in Article V(1)(b) "is closely linked with the public policy of the forum").

process rights.[95] So when it comes to foreign sovereigns, rights sounding in due process may implicate sovereign dignity as much as anything.[96]

Thus, at least in a case like today's, considerations like the right to be heard, the right to adequate representation, and the right to counsel fit not only within Article V(1)(b)'s due-process exception, but also within Article V(2)(b)'s public-policy exception.

The majority says that Venezuela "never asserted" those rights "at any point in the enforcement proceedings in the district court and in this court on appeal."[97] But "forfeiture cannot divest the court of its duty to resolve the public policy question."[98]

**IV**

Under the New York Convention, U.S. courts may decline to recognize an arbitral award if recognition would offend our nation's basic notions of justice. Recognition of the $100-million award here — rendered against a sovereign nation represented by an enemy imposter — offends those basic notions of justice. I respectfully dissent.

---

[95] *See Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82, 95–100 (D.C. Cir. 2002); *see also Fuld v. Palestine Liberation Org.*, 606 U.S. 1, 27–30 (2025) (Thomas, J., concurring in the judgment).

[96] *Cf. Price*, 294 F.3d at 97–98 (suggesting sovereignty, not due process, is the better conceptual framework for thinking about "harm" done to a foreign sovereign in court).

[97] Majority Op. at 14.

[98] *Enron Nigeria*, 844 F.3d at 288.